**UNITED STATES of America,**

v.

**Carl VELTMANN and Christopher Veltmann, Defendants.**

91–294–Cr–T–17A

United States District Court, M.D. Florida.

Dec. 7, 1994.

**930**

Joseph K. Ruddy, Asst. U.S. Atty., Tampa, FL, for U.S.

Allen A. Ackerman, Chicago, IL, for defendant Carl Veltmann.

JoAnn Wolfson, Tampa, FL, for defendant Christopher Veltmann.

## ORDER

GAGLIARDI, Senior District Judge.

The defendants have moved to suppress evidence derived from numerous warrantless entries into the Veltmann residence by police and fire officials during the nineteen hours following the fire that occurred there. Accordingly, a suppression hearing was held on November 2–3, 1994. This order constitutes a ruling on the motion to suppress.

### Findings of Fact

At approximately 9:41 p.m. on January 7, 1990, a fire was discovered at the residence of Carl and Elizabeth Veltmann, 3303 Gulf of Mexico Drive, Longboat Key, Florida. Police and fire personnel arrived shortly thereafter and extinguished the fire by 10:15 p.m. Firefighters removed the body of Elizabeth Veltmann, who was pronounced dead at 10:45 p.m.

Fire personnel immediately began to clear the smoke by venting the house, using fans and opening doors and windows. Smoke was heavy in the air, and it was unsafe to enter the home without a breathing apparatus until some time between 11:30 p.m. and 12:00 a.m. By that time, the visibility inside the home had improved. Coroner's office investigator Marshall Johnson described visibility as clear. Fire Marshal Carroll Mooneyhan characterized the visibility as "fairly clear" and "pretty good." Nevertheless, according to Sgt. Kintz of the police department, the darkness and remaining smoke made the initial investigation difficult. One could see only the area illuminated by a flashlight through the smoke and haze, and it was uncomfortable to stay in the house for long periods of time.

At approximately midnight or shortly thereafter, Sgt. Kintz made an initial walk-through of the house, accompanied by Firefighters Grimes and Carden, Fire Chief Fakelman, and coroner's office investigator Johnson. They observed several smoke detectors in the home that were not sounding an alarm. In some of them, they noticed that the battery was not making contact with the battery terminals, which would prevent the detector from functioning. They observed several molten blobs of plastic on the second and third floors that they believed to be smoke detectors that had melted in the intense heat of the fire, with batteries lying nearby. Kintz testified that several firemen had also observed batteries lying on the floor near the molten detectors. He also testified that since this indicated an extreme amount of

heat present during the fire, investigators would normally examine the walls and ceilings for other evidence, such as soot patterns, the visibility of nails in the walls (resulting from the superheating of the nails), etc. However, the darkness and smoke prevented Kintz and the others from making some of these observations, especially on the third floor where smoke was heaviest.

Johnson took photographs of the master bedroom (on the third floor), as well as other areas of the house. The photos of the bedroom depicted an outline of the victim created by soot patterns on the carpet. They also showed a phone near the bed that was off the hook. Johnson also photographed and seized some prescription drugs that he found in the bedroom/bathroom area.

During this initial investigation, the fire and police personnel determined that the fire had originated at three different points: the garage, the foyer, and the dumbwaiter in the kitchen. The garage and the foyer are located on the first level of the house, while the kitchen is on the second level. These points of origin, as well as the conclusion that arson had been the cause of the fire, had been determined by 3:00 a.m. By 5:00 a.m., all fire and police personnel had left the scene, but the police posted a guard to secure the premises.

At 9:00 a.m., investigators returned to the house to continue their investigation, as visibility in the house was greatly improved due to the daylight and the dissipation of the smoke. Fireman Carden, at the direction of the fire department, took photographs and a videotape of the scene that covered the entire house. He also seized seven or eight batteries from smoke detectors, some that were still in the detector and some that were lying on the floor. These came from various parts of the house, including the second and third floors.

Sgt. Kintz and fire personnel were able to observe soot patterns on the ceiling that indicated that the molten smoke detectors had been in place when the fire began. They were able to see the nails in the walls on the third floor, indicating intense heat on that floor. They determined that the door to the master bedroom, where Elizabeth Veltmann was found, had been open at the time of the fire.

Kintz requested that Dan Smith, an employee of General Telephone Company, meet him at the scene to help him discover why the Veltmann's alarm system had not automatically notified the alarm monitoring company, as it was designed to do. After Smith arrived later in the morning, Kintz and Smith examined the phone lines outside the house. Then, they examined the wires in the alarm panel inside the house on the third floor. Smith explained that the system would normally be wired to allow for "line seizure", which means that if the phone were being used or were off the hook, the alarm system would automatically seize control of the line and notify the monitoring company of an alarm. Smith discovered that the system had been rewired in a "parallel" arrangement such that line seizure could not occur. Smith also inspected phone wiring inside the house and found that the wiring in the foyer area had been destroyed by the fire.

During this entire investigation, no search warrant was sought or issued. In addition, the authorities did not have explicit consent to enter the premises. Christopher Veltmann, the son of Carl and Elizabeth Veltmann, arrived at the house at 2:00 a.m. on January 8 (during the initial investigation) and talked to police. He was cooperative, but he did not indicate whether he would allow investigators to reenter the house. Then, at 9:00 a.m., Christopher unexpectedly appeared at the fire station, where Sgt. Kintz interviewed him further. Christopher was advised that the investigation at the house was continuing, and he voiced no objection. Kintz told Christopher that he would need to secure the house somehow.

At noon or shortly thereafter, Carl Veltmann was notified of the fire and came to Kintz's office. At the end of the hour-long interview, Kintz stated that he was going to return to the house to continue the investigation. Carl did not indicate any objection, and soon after he said that he wanted to cooperate fully.

*Conclusions of law*

Two Supreme Court cases govern warrantless searches in the context of arson investigations. In *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), the Court held that even after a fire is extinguished, the firefighting personnel may remain on the premises without a warrant for a "reasonable time" to investigate the cause and origin of the fire. In *Tyler*, a furniture store began burning around midnight. Fire personnel suspended its investigation at 4:00 a.m. due to the smoke, haze, etc., and left the premises. The Court held that reentries by those personnel later that morning constituted a continuation of the initial investigation and did not require a warrant. The Court also noted that since the firemen were properly on the premises, they could seize any evidence of arson that lay in plain view.

The Court further developed these principles in *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). The plurality opinion (per Justice Powell) set forth three factors that govern the "constitutionality of warrantless and nonconsensual entries onto fire-damaged premises ...":

> whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment; whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy; and, whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. *Id.* at 292, 104 S.Ct. at 646.
>
> The object of the search is important even if exigent circumstances exist. Circumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined. *Id.* at 294, 104 S.Ct. at 647.

Albeit in dicta, the *Clifford* case further discussed limits on the scope of the permissible search by firemen legitimately present in the house. In *Clifford*, investigators reentered a private home during the afternoon following an early morning fire, found the cause and origin of the fire in the basement, then searched the upstairs area of the home.

The Court held that the reentry was invalid, distinguishing *Tyler* on its facts. *Id.* at 295–97, 104 S.Ct. at 647–49. However, even if the warrantless search of the basement had been valid, the plurality stated that the search of the upstairs area would still be invalid as beyond the scope of what is reasonably necessary to determine the cause and origin of the fire. "An administrative search into the cause of a recent fire does not give fire officials license to roam freely through the fire victim's private residence." *Id.* at 298, 104 S.Ct. at 649. The plurality further explained the difficulty in determining the proper scope of the search:

> In many cases, there will be no bright line separating the firefighter's investigation into the cause of a fire from a search for evidence of arson. The distinction will vary with the circumstances of the particular fire and generally will involve more than the lapse of time or the number of entries and reentries. For example, once the cause of a fire in a single-family dwelling is determined, the administrative search should end, and any broader investigation should be made pursuant to a criminal warrant. *Id.* at 298, fn. 9, 104 S.Ct. at 649, fn. 9.

Furthermore, the entire Court agreed with this dicta. Justice Stevens, in his concurring opinion, stated that "[w]e are also unanimous in our opinion that after investigators have determined the cause of the fire and located the place it originated, a search of other portions of the premises may be conducted only pursuant to a warrant...." *Id.* at 300, 104 S.Ct. at 650. Likewise, speaking for the dissenting justices, now-Chief Justice Rehnquist would have held that the search of the basement was permissible, "although the remaining parts of the house could not have been searched without the issuance of a warrant issued upon probable cause." *Id.* at 306, 104 S.Ct. at 653.

Concerning the case at hand, the defendants in their suppression motion have not specifically identified all of the evidence which they seek to suppress. Rather, they request that the Court "enter plenary suppression orders, including but not limited to, any and all evidence derived from the imper-

missible and unlawful entry by witnesses Smith and Keefe." The evidence pertaining to Keefe has been withdrawn by the prosecution and need not be discussed here. Therefore, the Court will rule on the evidence pertaining to Smith and other evidence expressly addressed at the suppression hearing.

■ Applying *Tyler* to these facts, the warrantless entries by fire and police personnel into the Veltmann residence between 9:41 p.m. and 3:00 a.m. were permissible. The exigent circumstance of fighting the fire justifies the entries, and the personnel remained on the premises for a reasonable time thereafter to investigate the origin and cause of the fire. Any observations made by those personnel and any evidence seized that was in plain view are admissible at trial.

■ Furthermore, the fact that fire and police personnel made reentries after 9:00 a.m. on January 8 did not violate the Fourth Amendment. The reentries constituted a continuation of the initial investigation and did not require a warrant. The police manifested their intent to continue the investigation by posting a guard during the period in which the house was empty, and the delay was justified due to the darkness, smoke, and haze of the early morning hours. Unlike the homeowners in *Clifford*, the Veltmanns at no time took steps "to secure the privacy interests that remained in their residence against further intrusion" by investigators.[1] *Id.* at 296, 104 S.Ct. at 648. However, at the time of these reentries, the cause and origin of the fire had already been determined. Therefore, this Court must determine whether the searches and seizures that occurred during these reentries were permissible.

■ The evidence derived from the entry by Smith of the telephone company must be suppressed. First, the object of this search was clearly to gather evidence of criminal activity rather than to investigate the cause of the fire, making the search impermissible under the *Clifford* rationale. After the investigators had already determined the fire

to be an arson, the ability (or lack thereof) of the alarm system to notify the monitoring company has no bearing on how the fire began. Rather, this is evidence of how the perpetrator successfully completed the crime. Second, for the same reasons just stated, Smith's actions cannot be labeled a continuation of the initial investigation that *Tyler* would permit. Rather, this search was part of a new stage of criminal investigation. Finally, the evidence sought was not in plain view and could not be seized even if Smith were legitimately present in the house. Smith had to open the alarm panel on the third floor of the house and closely inspect the wiring. Thus, under both *Tyler* and *Clifford,* the search and seizure relating to Smith's entry required a warrant and must be suppressed.

■ Any evidence of arson found in plain view on the first and second floors of the house is admissible. Since the reentries were permissible under *Tyler,* and the points of origin of the fire were located on these levels, the investigators were legitimately present at these locations. This evidence includes, but is not limited to, observations made by the personnel, the photographs and videotape taken by Carden, and the batteries seized by Carden from those levels.

■ The admissibility of evidence found on the third floor during the reentries presents a more difficult question. The dicta in *Clifford* seems to indicate that once the origin of the fire was determined to be on the first and second levels of the house, the investigators could not search the third level without a warrant. In other words, they would not be legitimately present on the third level to enable the seizure of evidence in plain view. However, the holding of *Tyler* allows the fire personnel to temporarily delay the investigation when smoke and darkness hinder their efforts and continue later in the morning without obtaining a warrant. In this case, the investigators were legitimately present on the third floor of the house well before the points of origin were determined, and they attempted to make the necessary

---

1. Christopher Veltmann did arrange to have the house boarded up after Kintz remanded the house to him between 3:00 and 4:00 p.m. on January 8, but all of the searches and seizures relevant to this suppression motion occurred prior to that time.

observations but were stymied due to the smoke, haze, and darkness. This was not the case in *Clifford*. Therefore, this Court rules that under the *Tyler* rationale, the investigators were justified in returning to the third level to seize any evidence that lay in plain view (but for the smoke) when they were present earlier on the morning of January 8, and this evidence is admissible. This includes personal observations, the photographs and videotape taken by Carden, and the batteries that were seized by him on the third level.

### Conclusion

As explained in the above findings of fact and conclusions of law, the defendants' motion to suppress is granted in part, in that any evidence derived from the entry by Dan Smith is inadmissible at trial.

So Ordered.