STATE OF NEBRASKA, APPELLEE,
v. THOMAS J. SILVERS, APPELLANT.
620 N.W.2d 73

Filed December 8, 2000.   No. S-00-214.

Charles D. Brewster for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Thomas J. Silvers appeals from an order of the Buffalo County District Court that denied his motion for postconviction relief.

## SCOPE OF REVIEW

A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court

will not be disturbed unless they are clearly erroneous. *State v. Soukharith, ante* p. 478, 618 N.W.2d 409 (2000).

## FACTS

In 1986, Silvers pled guilty to first degree arson and first degree felony murder and was sentenced for those convictions. No direct appeal was taken. In a motion for postconviction relief, Silvers sought relief on the basis that the arson conviction violated double jeopardy because arson is an underlying felony of first degree felony murder. He also asserted that he was denied effective assistance of counsel because his attorney failed to file a motion to suppress evidence seized by fire and police officials.

The district court summarily dismissed the arson conviction based upon a violation of double jeopardy but denied Silvers' request for relief regarding the felony murder conviction on the basis that his pleadings did not allege facts sufficient to justify an evidentiary hearing. On appeal, we concluded that Silvers' motion alleged sufficient facts to state a claim for postconviction relief and accordingly remanded the cause with directions that Silvers be granted an evidentiary hearing with the assistance of appointed counsel. See *State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998).

Silvers' motion for postconviction relief alleged that a fire broke out at his home in Kearney, Nebraska, on May 3, 1986, and that his stepdaughter, Sheila Heard, died on May 11 as a result of burns she suffered in the fire. He alleged that the alarm which summoned the Kearney Fire Department to his home was turned in at 1:23 a.m. on May 3. He claimed that firefighters arrived a short time later and extinguished the fire in approximately 5 to 6 minutes after their arrival. He alleged that the fire was confined to a bedroom area and that investigators were able to enter the home and examine the scene shortly after the fire had been extinguished.

Silvers alleged that after examining the point of the fire's origin, investigators contacted Gary Nelson, a deputy State Fire Marshal, who arrived at the scene at 1:48 a.m., and that based on Nelson's experience and training and the presence of various burn patterns, Nelson determined that the fire had been inten-

tionally set. Silvers further alleged that Det. Donald Dreyer of the Kearney Police Department was then contacted and requested to photograph the area of the home where the arson was believed to have occurred. Silvers claimed that firefighters departed the scene at 2:25 a.m., leaving only a guard outside the home, and that Dreyer left at 3 a.m., leaving no police officials either inside or outside the home.

Silvers alleged that while Nelson was at the hospital where the victim had been taken, he detected a strong odor of gasoline upon the victim's clothing. Silvers alleged that several meetings and telephone calls occurred during which various investigators and a senior deputy State Fire Marshal concluded that the fire had been caused by arson. Subsequently, a call was made requesting assistance from the Nebraska State Patrol.

Silvers further alleged that beginning at 6:30 a.m. on May 3, 1986, two deputy State Fire Marshals and a detective from the sheriff's office began searching his home for the sole purpose of gathering evidence. He claimed that a mobile crime unit from the Nebraska State Patrol arrived at 7:30 a.m. and participated in the search. He stated that these searches were carried out in the absence of any exigent circumstances, that they were not accomplished pursuant to either an administrative warrant or a search warrant, and that items of evidence were seized which had not been discovered during the initial investigation.

Silvers claimed that the evidence seized was then used to coerce him and his wife to consent to further searches of the home, which searches resulted in the seizure of 18 more items of evidence. He further alleged that in mid-July, another search resulted in the seizure of a barbell.

Silvers claimed that his trial counsel did not advise him of the potential illegality of the searches, did not file a motion to suppress the evidence seized during the searches, and failed to advise him of the true strengths of his case had the evidence been suppressed. Silvers claimed that he would not have entered pleas of guilty if his trial counsel had advised him of the viability of a motion to suppress and that his pleas of guilty were therefore not intelligently made due to ineffective assistance of counsel.

In its analysis of the evidence, the district court noted that Silvers had complained of three separate occasions on which he

believed law enforcement improperly conducted searches of his home for evidence. The first two searches occurred shortly after the fire, and the third search was conducted some time later.

The district court found that at the time Silvers entered his pleas, both he and his trial counsel believed that a plea agreement did in fact exist. It appeared that the plea agreement was to be "informal" in nature and involved a promise by the State not to seriously pursue the death penalty. The district court found that there was some question as to whether or not the State complied with this agreement. Evidence was offered by the State at the sentencing hearing, and the State requested imposition of the death penalty, but the State's evidence was not compelling, and the arguments concerning the aggravating circumstances were without merit.

The district court found that Silvers had asserted that his guilty pleas were entered, in part, to avoid the necessity of a trial and the effect that such a trial would have had on his family. Probably more important, the district court noted, was the desire of both Silvers and his trial counsel to limit the State's further investigation and to limit the evidence offered to the sentencing court in order to avoid the possible imposition of the death penalty. The district court suggested that the facts presented at sentencing did not warrant the imposition of a death sentence but that other facts, if brought to the attention of the sentencing court, might well have led to a different result.

The district court found that the pleas of guilty entered by Silvers protected his family from the pain which would have been occasioned by a lengthy trial and served to protect Silvers from the possible imposition of the death penalty. The district court concluded that Silvers had not shown a reasonable probability that had he been better informed of Fourth Amendment issues, he would have insisted on going to trial. The district court denied Silvers' motion for postconviction relief, and Silvers appealed.

## ASSIGNMENTS OF ERROR

Silvers asserts, summarized and restated, that the district court erred (1) in denying him postconviction relief, (2) in overruling his objections to the admission of exhibits 39 and 40 at

the evidentiary hearing, and (3) in overruling his request to amend his motion for postconviction relief.

## ANALYSIS

Silvers' first 12 assignments of error relate to his claim that the district court erred in denying his motion for postconviction relief. The basis of Silvers' claim is that he received ineffective assistance of counsel. Silvers claims that his trial counsel did not adequately advise him of his Fourth Amendment rights pertaining to evidence seized from his home after the fire. He alleges that improper searches and seizures occurred during the investigation of the fire by the police and the fire department. He claims that his trial counsel's failure to file a motion to suppress this evidence or to discuss defenses available to him pursuant to the Fourth Amendment was ineffective assistance and that had he been properly advised of these defenses, he would not have entered pleas of guilty and would have insisted on a trial.

There were three different searches of Silvers' home which form the basis for his assertion that he received ineffective assistance of counsel. The following legal principles are applicable to our review of the district court's decision regarding the searches in question and Silvers' postconviction claim based upon ineffective assistance of counsel.

A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous. *State v. Soukharith, ante* p. 478, 618 N.W.2d 409 (2000). In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, a convicted defendant has the burden to first show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id.*

When a conviction is based upon a guilty plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *State v. Buckman,*

259 Neb. 924, 613 N.W.2d 463 (2000). The entire ineffective-ness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice. *Id.*

In *State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998), we set forth the standards with respect to evidence seized from premises during a warrantless and nonconsensual entry follow-ing a fire. Three factors govern the constitutionality of warrant-less and nonconsensual entries onto premises that are damaged by fire: whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment, whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy, and whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. *Id.* See, also, *Michigan v. Clifford*, 464 U.S. 287, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984).

If reasonable privacy interests remain in the property damaged by fire, in the absence of a consent, any official entry must be made pursuant to a warrant or pursuant to exigent cir-cumstances. *Id.* A burning building creates an exigency that jus-tifies the warrantless entry by fire officials to fight the blaze. *Id.* In addition, once fire officials are in the building, they may remain there without a warrant for a "reasonable time" to ensure that the fire will not reignite and to investigate the cause of the fire after it has been extinguished. See *id.* See, also, *Michigan v. Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978). During this time, warrantless seizures of evidence found in plain view while inspecting the premises are also constitutional. *Id.* However, when reasonable expectations of privacy exist, addi-tional investigations after the fire has been extinguished and officials have left the scene must be made pursuant to a warrant or a new exigency. *Id.*

What constitutes a "reasonable time" depends upon the cir-cumstances of the case. The U.S. Supreme Court held that when officials could not remain in a building following a fire to inves-tigate its cause due to darkness and smoke, a search that occurred after the officials left the scene and returned during

daylight was a continuation of the initial search and did not require a warrant. See *id.* See, also, *U.S. v. Veltmann,* 869 F. Supp. 929 (M.D. Fla. 1994) (delay justified due to darkness, smoke, and haze). However, when officials leave a private residence and return after the owner has taken steps to secure the area, reentry without a warrant is impermissible. *Michigan v. Clifford, supra.*

### FIRST SEARCH

Silvers argues that a search that was conducted at approximately 6:30 a.m. on May 3, 1986, was illegal and was for the sole purpose of obtaining evidence to prove that he had committed the crime of arson. During this search, certain evidence was seized from Silvers' home. Following is a list of the items seized and the location where they were found: empty milk container (607 10th Drive, Kearney, Nebraska); sheet linen of victim (victim's waterbed); door knob (hallway just outside victim's bedroom); Discover magazine (floor of bathroom adjacent to victim's bedroom); burned tissue (floor of bathroom shower); clock (victim's waterbed); burned tissue (along wall of bathroom); burned cloth (east end of bathroom floor); hollow-cored door (victim's bedroom); book of cardboard matches (bathroom counter or vanity); bathroom door, hollow-cored (intact with part of jamb); one red cardboard match (living room floor); book of cardboard matches (bathroom counter or vanity, upstairs hall); beer can three-quarters full of liquid (sidewalk adjacent to 607 10th Drive, Kearney, Nebraska); book of cardboard matches (front steps of 1010 Sixth Avenue, Kearney, Nebraska); and book of cardboard matches (curb on north side of 1010 Sixth Avenue, Kearney, Nebraska).

The district court assumed that all entries of Silvers' home between 1:30 a.m. and 4:20 p.m. on May 3, 1986, were warrantless and nonconsensual. It found that the following sequence of events had occurred in the early morning hours of May 3: Around 1:23 a.m., the fire department was called to a structure fire at Silvers' home. Law enforcement officers and Kearney volunteer firefighters arrived at the scene and extinguished the blaze by approximately 1:45 a.m. The fire continued to smolder for a period of time thereafter.

At about the same time, Nelson was contacted. He proceeded to the scene and was met by the fire chief, who provided Nelson with general information concerning the fire. Nelson was advised that the occupants, including one child, had been taken to the hospital. He then began his own investigation to determine the cause of the fire. He concluded that a flammable liquid was necessarily involved and proceeded to the hospital to make further inquiry of the occupants and to determine the extent of the injuries involved.

At the hospital, Nelson was advised that the victim had second and third degree burns over approximately 90 percent of her body and had suffered several lacerations. He was advised by one of the attending police officers that clothing had been removed from the victim and that some of the clothing "smelled like gasoline."

Silvers and his wife were subsequently interviewed by Nelson. Silvers' wife advised Nelson that she had been awakened by a "boom" or explosion. She believed the fire could have been caused by a natural gas leak. Silvers told Nelson that the fire had probably started in the "heater control" of the victim's waterbed. He stated that the heater control was on the right side of the bed next to the wall and that this was where the fire had started.

Nelson then interviewed additional persons, including ambulance attendants who had transported the victim to the hospital. These individuals had noticed a strong odor of gasoline on the victim but repeated the mother's assertion that the fire had started when something "blew up." Nelson then returned to the scene of the fire, and the house was reentered to continue the investigation as to the cause of the fire.

The district court found that Nelson had requested the assistance of another deputy State Fire Marshal, Bradley Hoppe, to assist Nelson in determining the cause of the fire. Hoppe testified that he arrived at the scene between 5 and 6 a.m. and began an external examination of the building at approximately 7 a.m. He then reentered the home at 7:50 a.m. to further his investigation. Hoppe testified that when he arrived on the scene, the information which had been relayed to him created a suspicion that arson was the cause of the fire. He testi-

fied, however, that he could not determine the cause of the fire without completing his own investigation and that it took several hours before he came to his own independent conclusion that arson was the cause of the fire. Based upon this evidence, the district court found that Nelson's and Hoppe's investigations of the fire were proper and were for the purpose of determining the cause of the fire rather than merely garnering evidence of criminal activity.

We will not disturb the findings of the district court unless they are clearly erroneous. See *State v. Soukharith, ante* p. 478, 618 N.W.2d 409 (2000). After reviewing the evidence, we cannot say that the district court's conclusion that these investigations were for the purpose of determining the cause of the fire was clearly erroneous.

### SECOND SEARCH

Silvers also complains of a search conducted between 4:20 and 5:05 p.m. on May 3, 1986. During this search, fire and law enforcement personnel seized 18 additional pieces of evidence. The district court found that Silvers had acknowledged that the search was conducted upon a consent to search given by Silvers and his wife. Silvers' motion for postconviction relief alleged that the consent was coerced by the actions of Det. Jeff Hupp of the Kearney Police Department.

During this search, the following items were seized: waterbed heater, two curling irons (victim's bedroom), two bedsheets and afghans (victim's waterbed), blood smear and tissue (victim's bedroom on west wall), clawhammer (garage), ball peen hammer (garage), two 1-gallon red gas cans (garage), liquid in the gas cans, 1-quart container of charcoal starting fluid and a sample of the contents therein (garage), a sample of liquid found in a pan on the floor in which brushes were soaking (garage), yellow flashlight (kitchen counter next to entrance to garage), two empty milk cartons (kitchen drainer next to sink), and two pink shoes (victim's bedroom at foot of waterbed).

The district court found that nothing in the evidence offered by Silvers, not even his own testimony, revealed any indication that Silvers or his wife had been coerced into giving consent for law enforcement to conduct the search between 4:20 and 5:05

p.m. The district court found that without some evidence of a legitimate Fourth Amendment complaint, the court could not find fault with Silvers' trial counsel for not raising, pursuing, or advising Silvers of a meritless legal claim.

We review the findings of the district court for clear error. See *State v. Soukharith, ante* p. 478, 618 N.W.2d 409 (2000). The record does not support Silvers' claim that he and his wife were coerced into this search. It was not disputed by Silvers that he had consented to the search, and reports offered in evidence noted that a consent to search had been signed by both Silvers and his wife. The only evidence to which Silvers referred was that his wife declined to give consent to search the home while she was being questioned. That evidence does not establish that Silvers was coerced into giving consent to the search.

Since nothing in the record demonstrated that the consent to this search was coerced, Silvers has not established that his trial counsel was ineffective. Thus, we conclude that the district court's findings as to this search are not clearly wrong.

### THIRD SEARCH

A third search of Silvers' residence occurred in mid-July 1986. Silvers argues that a barbell discovered during this search contributed to his decision to plead guilty. The district court found that Silvers apparently believed that the barbell could have incriminated him in an assault on the victim shortly before he set the fire.

In his motion for postconviction relief, Silvers alleged that the failure of his trial counsel to seek suppression of this item of evidence contributed to his decision to plead guilty. The district court found that such allegation was directly contradicted by Silvers' postconviction testimony:

> Q Did Mr. Hogg have any discussion with you about the State's locating the weight bar in the basement of your residence?
>
> A Just prior to me entering the plea.
>
> Q And what influence, if any, did the location of that — finding that weight bar have to do with the entry of the plea?
>
> A I believe at that time I had already decided to plead.

Q So it really didn't play a role in your making that decision?

A Not a significant one.

Based on Silvers' testimony, the district court found that the seizure of the barbell had no significant bearing on Silvers' decision to enter a plea of guilty regardless of whether the search was appropriate. We cannot say that the district court was clearly erroneous in concluding that the discovery of the barbell did not play a role in Silvers' decision to plead guilty.

### EXHIBITS 39 AND 40

Next, Silvers argues that exhibits 39 and 40, transcripts of his interviews with private investigator Tom Gorgan, should not have been admitted into evidence at the postconviction evidentiary hearing. Gorgan had been contacted by Silvers' family, and Silvers' trial counsel allowed Gorgan to interview Silvers. The interview in exhibit 39 took place on July 10, 1986, at the Buffalo County Detention Center in Kearney. The interview in exhibit 40 took place on July 11 at the same location.

Exhibits 39 and 40 were offered by the State and received by the district court over several objections by the defense. Silvers' objections included foundation, hearsay, relevancy, attorney-client privilege, and best evidence. The district court overruled all of these objections except Silvers' objection based on relevancy, which the court took under advisement. During the cross-examination of Silvers, the district court determined that the matter contained in exhibits 39 and 40 was relevant because it discussed information that would affect the nature of the representation of Silvers by his trial counsel.

However, our analysis of Silvers' argument with regard to the admissibility of exhibits 39 and 40 is hereinafter limited to a discussion of the foundation required for the admission of evidence of this nature because in his brief, Silvers argues only his objection based on foundation. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Sheets, ante* p. 325, 618 N.W.2d 117 (2000).

Silvers relies on *State v. Pearson*, 215 Neb. 339, 338 N.W.2d 445 (1983), in which we stated that for a tape recording of a telephone conversation between a witness and a defendant to be

admissible in evidence, it need only be shown that the conversation is relevant; that it accurately reflected the conversation; that the tapes had not been altered, changed, or erased in any way; and that the voices heard on the tapes were those of the witness and the defendant.

The foundation for these exhibits is governed by the Nebraska Evidence Rules. In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by such rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Rieger, ante* p. 519, 618 N.W.2d 619 (2000). Neb. Rev. Stat. § 27-901(1) (Reissue 1995) provides that the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Silvers' trial counsel testified that Silvers' family hired Gorgan to assist him in Silvers' defense and that he allowed Gorgan to interview Silvers. He stated that after the interviews, Gorgan delivered exhibits 39 and 40 to him within a day or two of July 11, 1986. Silvers' trial counsel stated that during a subsequent meeting with Silvers, he discussed the contents of these exhibits with Silvers, and Silvers confirmed the contents of the exhibits. Silvers' trial counsel stated that exhibits 39 and 40 were thereafter sealed in an envelope and marked not to be opened except in the presence of a judge. The envelope was later opened in the presence of a Buffalo County Court judge.

We conclude that the State has established sufficient foundation for the admissibility of exhibits 39 and 40, which set forth the details of the crimes committed by Silvers. We are not certain how the admissibility of exhibits 39 and 40 relates to Silvers' claim for postconviction relief based upon ineffective assistance of counsel. However, these exhibits do disclose what Silvers' trial counsel knew about the facts surrounding the crime and create the inference that if such facts were disclosed either at trial or sentencing, the death penalty might have been imposed.

The evidence that could have been presented at trial would have established that the victim sustained several blows to the

head, resulting in a skull fracture. The victim sustained a severe laceration to the hand that was described as a defensive injury sustained while raising her hand to defend against a blow from a blunt instrument. She also had several lacerations on her liver as a result of blunt trauma. The evidence would have further established that the victim had been saturated with gasoline and then set on fire. Silvers' pleas served to protect him from the imposition of a death sentence.

The district court noted that Silvers had on several occasions stated that his entry of guilty pleas was in part to avoid the necessity of trial and the effect that such trial would have had on his family. The district court found that more important in the decision to enter guilty pleas was the fact that both Silvers and his trial counsel wanted to limit the State's further investigation and limit the evidence offered at sentencing in order to avoid the possible imposition of the death penalty. The district court found that the facts presented at the time of the sentencing hearing would not have warranted the imposition of the death penalty. The district court pointed out that if the facts of the crime had been brought to the attention of the sentencing court, a death sentence might have resulted. Since Silvers has not established that exhibits 39 and 40 were improperly admitted or improperly considered by the district court, we therefore conclude that this assignment of error has no merit.

## REQUEST TO AMEND

Silvers' final argument is that the district court erred in overruling his request to amend his motion for postconviction relief. On August 11, 1999, 2 days before the evidentiary hearing was scheduled, Silvers filed an amended motion for postconviction relief. The amended claim alleged that the trial court had failed to properly advise Silvers of the crimes to which he was pleading guilty at the time of his plea. The district court found that this amended claim had not been timely filed and proceeded with the evidentiary hearing on Silvers' original motion.

"The court may, either before or after judgment, in furtherance of justice, and on such terms as may be proper, permit a party upon motion to amend any pleading, process, or proceeding by . . . inserting other allegations material to the case . .

. .." Neb. Rev. Stat. § 25-852 (Reissue 1995). The statute is to be liberally construed so as to prevent a failure of justice. *Otey v. State*, 240 Neb. 813, 485 N.W.2d 153 (1992). Thus, the decision to grant or deny an amendment to a pleading rests in the discretion of the court. *Id.*

We conclude the district court did not abuse its discretion in disallowing Silvers' amended motion. This action for postconviction relief was on remand for an evidentiary hearing with specific directions from this court, and Silvers failed to timely raise this issue prior to the hearing. Therefore, we find no merit to this final assignment of error.

## CONCLUSION

The victim was a 16-year-old girl who was doused with gasoline and set on fire in her bedroom. She had sustained a skull fracture and lacerations to her hand and liver as a result of blunt trauma. She died 8 days later from burns over 90 percent of her body. It can reasonably be inferred that Silvers pled guilty in an attempt to avoid a trial that would have elicited the gruesome details of this heinous murder and to avoid the death penalty. Much if not all of the evidence obtained during the first search was in plain view in the area of the fire. The second search was determined to have been made with the written consent of Silvers and his wife. The third search, in which the barbell was discovered, was admittedly of no consequence to Silvers.

Silvers' guilty pleas were made to avoid the death penalty. He has not established a reasonable probability that but for errors of counsel, he would have insisted on going to trial rather than pleading guilty. We therefore affirm the judgment of the district court which denied Silvers' motion for postconviction relief.

AFFIRMED.