STATE OF NEBRASKA, APPELLEE, V.
CHRISTOPHER SCOTT DECKER, APPELLANT.
622 N.W. 2d 903

Filed March 9, 2001. No. S-00-488.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Following a jury trial in the district court for Adams County, Christopher Scott Decker was convicted of first degree murder, third degree assault, and two counts of using a deadly weapon to commit a felony. One of the weapons counts involved the use of a firearm and is a Class II felony, while the other involved the use of a sword and is a Class III felony. The assault charge is a Class II misdemeanor. On April 18, 2000, the district court sentenced Decker to life in prison for the murder conviction; incarceration for a term of 18 to 20 years on the weapons count involving the use of a sword, consecutive to the life sentence; incarceration for 40 to 50 years on the weapons count involving the use of a firearm, consecutive to the sentence for use of the sword in the commission of a felony; and incarceration for 1 year on the assault charge, concurrent to all other sentences. Decker perfected this direct appeal.

## BACKGROUND

All four of Decker's convictions arose from an incident which occurred at the home of Kenneth Skidmore in Hastings, Nebraska, during the early morning hours of July 10, 1999. The

facts and circumstances with respect to what transpired are largely undisputed.

For at least 2 years prior to the incident, Decker had had a romantic relationship with Sonya Ballard. The two moved to Clay Center, Nebraska, in the summer of 1997 and lived together in an apartment there. They were engaged to be married on August 2, 1999. However, during the month preceding the July 10 incident, Ballard had been spending significant amounts of time with Skidmore at his mobile home in Hastings. After finding a note on her vehicle stating that Decker wished to see her, Ballard traveled from Hastings to Clay Center where she met Decker at their apartment on the afternoon of July 9. They talked briefly before Decker left for work at approximately 2:30 p.m. Decker told Ballard that he wished to continue the discussion about their relationship when he returned from his work shift at approximately 11:30 that evening. Ballard remained at the apartment for a short time after Decker left, but then decided to return to Skidmore's home and left a note for Decker informing him of this.

After completing his shift at a meatpacking plant in Hastings, Decker returned to the apartment at approximately 11:30 p.m. and found the note left by Ballard. He became upset because he thought that Ballard was not "putting much stock in [their] relationship," and he believed that "there might be something going on" between Ballard and Skidmore.

In an attempt to calm himself, Decker took one of the two Valium tablets Ballard had left at the apartment and went to a bar in Clay Center to "drown [his] sorrows." At the bar, Decker consumed two glasses of a mixed alcoholic beverage known as Long Island iced tea while he played pool. A witness who observed him during this time said that he seemed depressed. Decker left the bar at approximately 1 a.m. and returned to his apartment. Upon his arrival there, he took the other Valium tablet because "all the feelings of hurt and everything came back."

After staying at the apartment for a short time and becoming more upset, Decker set out for Skidmore's home in Hastings, carrying with him his 4-foot-long broadsword. Testifying in his own defense, Decker stated that his purpose in going to Skidmore's home was to talk to Ballard and not to harm anyone,

but he carried the sword because he knew Skidmore had a firearm in his home. Decker drove his pickup truck from his apartment in Clay Center to Skidmore's mobile home in Hastings, arriving at approximately 3 a.m. on July 10.

When Decker arrived at Skidmore's mobile home, he first knocked on the front door and then tapped on some windows while calling for Ballard. He then entered the home through an unlocked back door. After first looking into a bedroom where he observed a male figure asleep on the bed, Decker eventually made his way through the home and opened the door to the second bedroom where he saw two figures lying on the bed. Decker propped the sword up against a wall just outside the second bedroom and then turned on the bedroom light, observing Skidmore and Ballard in the bed together, both unclothed. Upon observing Decker, Skidmore took a pistol from the nightstand and placed it on the bed, pointing it in the general direction of Decker with his hand resting on top of it. Skidmore did not raise the pistol from the bed. A heated conversation ensued, and Skidmore eventually stated to Decker, "Don't yell at me in my own God damn house." Ballard then pleaded with Decker to leave.

Decker turned as if to leave, but instead grabbed the sword and spun around, swinging the sword at Skidmore. Decker, who is more than 6 feet 8 inches tall and weighs approximately 320 pounds, attacked Skidmore repeatedly with the sword, causing 23 separate cutting and stabbing wounds to various parts of Skidmore's body, including his scalp, neck, trunk, and upper extremities. During the initial moments of the attack, Decker also struck Ballard with the sword, causing a 10-inch scalp wound. Bleeding from this wound, Ballard ran from the room to seek help from the other occupant of the mobile home, Skidmore's friend Curtis Renfro, who occupied the other bedroom. After putting on some clothing, Ballard went to the bedroom and told Renfro, "Skid is down. He needs your help." Before Renfro could react, a blood-soaked Decker approached Ballard and Renfro, informed Renfro that "[i]t's none of your business," and then dragged Ballard back to the bedroom where Skidmore lay on the floor, bleeding from his wounds. En route to the bedroom, Decker told Ballard that he was going to prison and that he wanted her to see what he was going to do. Upon

arriving in the room, Decker realized that Skidmore was still alive and became further enraged. Using Skidmore's pistol, he fired several rounds into Skidmore's head at close range.

Ballard escaped from the home and ran to a neighbor to summon assistance. After shooting Skidmore, Decker left the home and proceeded to the Hastings Police Department to turn himself in. Hearing Decker leave the mobile home, Renfro entered Skidmore's bedroom and observed him lying dead on the floor. Because there was no telephone in the home, Renfro went to seek help.

Within a short time after these events, Sgt. Mathew Workman and Det. Gary Reed of the Hastings Police Department encountered Decker in a telephone booth outside the Hastings police station, where he surrendered to them. Both before and after being advised of his *Miranda* rights, Decker made several unsolicited statements to Workman and Reed while still outside the police station, including, "I know, I know I did a serious crime" and "I'm sorry. I'm sorry. I know I really screwed up. I'm not armed. I left the gun and sword there." When the officers advised Decker of his *Miranda* rights and took him inside the station, Decker informed them that he wished to make a statement. Reed obtained a tape recorder and a *Miranda* form. Reed again read Decker the *Miranda* rights, this time directly from the form, and both Reed and Workman signed the form. Decker then gave a statement regarding the events which had transpired. Both Reed and Workman indicated that Decker was calm throughout the time they dealt with him, even during his statement.

Decker was originally charged with four counts, including murder in the first degree, assault in the second degree, and two counts of use of a deadly weapon in the commission of a felony. He entered pleas of not guilty to all charges. The jury found Decker guilty of the murder and weapons charges. With respect to the assault charge, it found Decker guilty of the lesser-included offense of assault in the third degree. After overruling Decker's motion for a new trial, the district court imposed the sentences set forth above, allowing Decker no credit for time served. Additional facts will be set forth where pertinent to our analysis of Decker's assignments of error.

## ASSIGNMENTS OF ERROR

Decker asserts, restated and renumbered, that the district court erred in (1) receiving Reed's testimony regarding the substance of Decker's tape-recorded statement in lieu of the recording itself, (2) convicting Decker on two counts of using a weapon to commit a felony when he was convicted of only one felony, (3) receiving photographs of Skidmore into evidence and allowing a pathologist to testify regarding Skidmore's injuries and cause of death, (4) determining that the evidence was sufficient to support the convictions, and (5) imposing a sentence which was "excessive and disproportionate to the severity of the offense when considered with [Decker's] background and prior record."

## ANALYSIS

### Admission of Testimony Regarding Substance of Tape-Recorded Statement

■ During trial, Decker objected to questions propounded to Reed regarding statements made by Decker during the tape-recorded custodial interrogation, which occurred at the Hastings Police Department, on the ground that the recording itself constituted the "best evidence." In his first assignment of error, Decker contends that the district court erred in overruling this objection. In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Sanchez-Lahora, ante* p. 192, 622 N.W.2d 612 (2001); *State v. Silvers*, 260 Neb. 831, 620 N.W.2d 73 (2000).

■ Decker argues that Reed's testimony regarding the content of his recorded statement should have been excluded under Neb. Evid. R. 1002, which provides:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress or of the Legislature of the State of Nebraska or by other rules adopted by the Supreme Court of Nebraska.

Neb. Rev. Stat. § 27-1002 (Reissue 1995). This "original writings" rule, which is sometimes inaccurately referred to as the "best evidence" rule, applies only if the party offering the evidence is seeking to prove the contents of a writing, recording, or photograph. See *State v. Obermier*, 241 Neb. 802, 490 N.W.2d 693 (1992). See, also, *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000); *Suess v. Lee Sapp Leasing*, 229 Neb. 755, 428 N.W.2d 899 (1988). Therefore, Decker's argument has merit only if the State was using Reed's testimony to prove the contents of Decker's recorded statement.

Decker relies on *State v. Harding*, 184 Neb. 159, 165 N.W.2d 723 (1969), in which we held that a transcribed but unsigned statement of the defendant taken by a court reporter who died prior to trial was inadmissible at trial because the rights of confrontation and cross-examination were not present to ensure its accuracy. In *Harding*, the State was attempting to prove the content of the transcribed statement through the statement itself. While we rejected this attempt for the reasons stated above, we further stated that "nothing we have said herein negates the admissibility of independent evidence verifying the authenticity of oral statements or admissions the defendant made at the time the testimony was transcribed by the reporter." *State v. Harding*, 184 Neb. at 169, 165 N.W.2d 729. Thus, *Harding* refutes rather than supports Decker's argument that the district court erred in permitting Reed to testify as to the content of his recorded statement.

Likewise, Decker's argument finds no support in *State v. Martin*, 198 Neb. 811, 255 N.W.2d 844 (1977), another case on which he relies. There, we held that it was not error to admit the transcription of a taped statement where the tape itself was also received in evidence. *Martin* is inapposite here. Even if we accepted Decker's contention that the inflection and tone of his voice on the tape recording would have assisted the jury in determining his intent at the time of the events in question, this would not obligate the State to prove the content of the tape recording as a material element of its case, and the original writing rule codified at § 27-1002 is therefore inapplicable. As succinctly noted by one commentator:

> Unless the substantive law makes the proof of the contents of the writing, recording or photograph essential, then a witness who has first-hand knowledge of an event memorialized by a writing or a scene depicted in a photograph may testify regarding the event or scene without satisfying the original writing rule. The fact that a writing, recording or photograph offers the "best evidence" available of the transaction or scene does not limit the form of the admissible evidence.

R. Collin Mangrum, Mangrum on Nebraska Evidence 727 (2000).

### CONVICTION ON TWO COUNTS OF USE OF WEAPON TO COMMIT FELONY

Decker contends that since he was convicted of only one felony, his two convictions for use of a weapon to commit a felony violate the double jeopardy provisions of both the state and the federal Constitutions. Decker maintains that Neb. Rev. Stat. § 28-1205 (Reissue 1995) does not provide that each weapon used or possessed during the commission of a single felony is a separate crime.

 We begin our analysis of this issue by examining the language of § 28-1205, the statute which defines the offense:

> (1) Any person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state or who unlawfully possesses a firearm, a knife, brass or iron knuckles, or any other deadly weapon during the commission of any felony which may be prosecuted in a court of this state commits the offense of using a deadly weapon to commit a felony.
>
> (2)(a) Use of a deadly weapon other than a firearm to commit a felony is a Class III felony.
>
> (b) Use of a deadly weapon which is a firearm to commit a felony is a Class II felony.
>
> (3) The crimes defined in this section shall be treated as separate and distinct offenses from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed.

Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Neiss*, 260 Neb. 691, 619 N.W.2d 222 (2000); *State v. Hernandez*, 259 Neb. 948, 613 N.W.2d 455 (2000). In reading a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *State v. Bottolfson*, 259 Neb. 470, 610 N.W.2d 378 (2000). Although penal statutes are strictly construed, they are given a sensible construction in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served. *State v. Bottolfson, supra*; *State v. Cebuhar*, 252 Neb. 796, 567 N.W.2d 129 (1997).

The Double Jeopardy Clauses of both the federal Constitution and the Nebraska Constitution protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000). A determination of whether two convictions in a single trial lead to multiple punishment depends upon whether the Legislature, when designating the criminal statutory scheme, intended that cumulative sentences be applied for conviction on both offenses. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997); *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996).

The Legislature's purpose in enacting § 28-1205 was to discourage individuals from employing deadly weapons in order to facilitate or effectuate the commission of felonies and to discourage persons from carrying deadly weapons while they commit felonies. See *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989). Thus, the statute is designed to regulate the manner in which felonies are committed. *Id.* This means the statute acts to prevent the threat of violence and accompanying danger to human life present whenever one has a deadly weapon within one's immediate control during the commission of a felony. *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999).

This purpose, together with the plain language of the statute, leads us to conclude that Decker's convictions on both counts of use of a deadly weapon to commit a felony must stand. By enacting § 28-1205, the Legislature proscribed individuals from employing any deadly weapon in an effort to facilitate *any* felony that *could* be prosecuted in a court of this state. Thus, the "individual act" of using any deadly weapon to commit a felony is prohibited. It follows that when a person uses more than one such weapon to commit a single felony, each use is a separate, identifiable act that can be punished under the statute. As such, the Legislature constructed a statutory scheme that does not violate the double jeopardy provisions of either the state or the federal Constitution.

■ Furthermore, the record clearly reflects that Decker first used the sword and then the firearm to kill Skidmore. The pathologist who performed the post mortem examination testified that wounds inflicted by both weapons caused Skidmore's death. Section 28-1205 separately proscribes the use of such weapons in the commission of a felony, in that use of a firearm constitutes a Class II felony under § 28-1205(2)(b), whereas the use of a weapon other than a firearm in the commission of a felony is a Class III felony under § 28-1205(2)(a). Each of these "use" offenses are "separate and distinct offenses from the felony being committed," under § 28-1205(3). Thus, we hold that where the record reflects the use of multiple weapons in the commission of a single felony, the use of each weapon may constitute a separate violation of § 28-1205. We therefore find no error by the district court in convicting and sentencing Decker on the two separate counts of use of a deadly weapon to commit a felony.

ADMISSION OF PHOTOGRAPHS AND PATHOLOGIST'S TESTIMONY

Decker assigns as error the trial court's admission, over his objection, of various photographs showing wounds inflicted upon Skidmore. He also alleges the district court erred in admitting the testimony of Dr. Jerry Jones, the pathologist who conducted the autopsy. Decker's objections to these items of evidence were based upon an assertion that it was cumulative, in that other "testimony offered indicates that Mr. Decker caused

the death of Mr. Skidmore" which was "really not contested," and that whatever probative value such evidence may have would be outweighed by the danger of unfair prejudice. The objections were overruled; 3 photographs of Skidmore's body taken at the crime scene and 14 photographs taken during the post mortem examination were received. Jones testified regarding his autopsy findings. Using photographs, he described each of the 23 cutting and stabbing wounds as well as the 4 gunshot wounds to the head. Jones noted that while all of the gunshot wounds were inflicted with the gun in close proximity to Skidmore's head, one of the shots was inflicted while the muzzle of the gun was in contact with the skin. He opined that the cause of death was "multiple penetrating gunshot wounds of the head and multiple cutting and stabbing wounds of the body involving the scalp, neck, trunk and upper extremities." He further noted that no single wound caused death, but all were important. In this regard, Jones explained:

> The gunshot wounds to the head in and of themselves would cause death, and the totality of the cutting and stabbing wounds would certainly cause enough bleeding externally, as well as some internally, to cause death. So, there are several of the cutting wounds and stab wounds which were quite deep, as you see, but even the ones that are less deep but go through the skin, into the underlying soft tissue also bleed.

Neb. Evid. R. 403 permits the trial court to exclude relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice." Neb. Rev. Stat. § 27-403 (Reissue 1995). See *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998). However, the fact that evidence is prejudicial is not enough to require exclusion, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party. It is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under § 27-403. *State v. Carter, supra.* Thus, the trial court must balance the probative value of the evidence against the prejudicial factors listed in § 27-403, and an appellate court will uphold the trial court's decision in this regard in the absence of an abuse of discretion. See *State v. Fahlk*, 246 Neb. 834, 524

N.W.2d 39 (1994). See, also, *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981).

The admission of photographs of a gruesome nature rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). If a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if gruesome. *State v. Bjorklund, supra.* Likewise, in a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999).

In overruling Decker's objections to both the photographs and the pathologist's testimony, the district court explained that such evidence would help the jury determine whether Decker was guilty of murder in the first degree, murder in the second degree, or manslaughter. Additionally, the photographs as interpreted by Jones' testimony show the condition of Skidmore's body, establish the nature and extent of the injuries, and in conjunction with Jones' testimony, indicate the cause of Skidmore's death. Multiple photographs were reasonably necessary to depict each of the 27 separate wounds inflicted upon Skidmore, and the photographs are therefore not cumulative. We conclude that the district court did not abuse its discretion in receiving the photographs and Jones' testimony over Decker's objection.

SUFFICIENCY OF EVIDENCE

Decker next contends that the district court erred in overruling his motions for directed verdict and new trial on grounds that the evidence was insufficient to support his conviction for murder in the first degree. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the

State, is sufficient to support the conviction. *State v. Quintana, ante* p. 38, 621 N.W.2d 121 (2001); *State v. Rieger,* 260 Neb. 519, 618 N.W.2d 619 (2000).

Testifying in his own defense at trial, Decker denied that he intended to harm Skidmore and maintained that he "snapped" and "freaked out" upon encountering Ballard in bed with Skidmore and being told by her to leave. Sunday Ohia, Ph.D., a pharmacologist who testified as an expert witness on behalf of Decker, stated that while alcohol and the chemical components of Valium are central nervous system depressants, each can have a "paradoxical effect" and cause rage and hostility instead of calmness. Responding to a hypothetical question, Ohia stated his opinion that there was a "possibility" that a person who consumed two Long Island iced teas and two Valium tablets could experience such a paradoxical effect. On the strength of this, Decker argues that there was insufficient evidence upon which the jury could conclude that he formed the requisite intent to commit murder in the first degree.

However, Decker's testimony that he intended no harm and the evidence with respect to his ingestion of alcohol and Valium were not the sole sources of evidence in the record going to the issue of intent. A criminal defendant's mental process of forming the intent to kill is not always susceptible to proof by direct evidence, and it may be proved by circumstantial evidence. *State v. Clark, supra; State v. Lyle,* 245 Neb. 354, 513 N.W.2d 293 (1994). The interpretation of such evidence is generally a matter of fact which precludes a directed verdict and is properly left to the jury to determine. *State v. Clark, supra.*

There is both direct and circumstantial evidence in this record to support a finding that Decker killed Skidmore purposely and with deliberate and premeditated malice. It is undisputed that Decker left his apartment in Clay Center and traveled some 30 miles to Skidmore's home in Hastings at approximately 2 a.m., armed with his sword. When law enforcement officers searched Decker's apartment following his arrest, they found sharpening stones and honing oil on a coffee table. Ballard testified that the sword was usually dull and that the sharpening stones and honing oil were not normally kept on the coffee table in Decker's apartment. Jones testified that Skidmore's injuries included

multiple "cutting wounds" produced by a "slicing or slashing motion," some of which cut "through the skin, fat and muscle, actually into bone." One of Skidmore's fingers was amputated by a "slice across the outside of the right hand." From this evidence, a jury could reasonably infer that Decker sharpened the sword in preparation for an anticipated encounter with Skidmore.

There is undisputed evidence that Decker entered Skidmore's home without permission at approximately 3 a.m. and initiated the attack which led to Skidmore's death. He admitted telling police immediately following the incident that Skidmore had made no threatening gesture with his pistol. Some of Skidmore's injuries were described by Jones as "consistent with defensive wounds" likely sustained by Skidmore in attempting to ward off the attack. Decker agreed with this assessment during his cross-examination.

Decker also testified that when he returned to the bedroom where Skidmore lay following the sword attack, he became angry because Skidmore was not dead and "unloaded" the pistol into his head. Reed testified that Decker described this incident during his statement as follows:

A He [Decker] said he picked up the gun. And as [Skidmore] was laying on the floor, in his words, he said "Mother fucker, do you want me to kill you quick? Tell me how to get this safety off." And he was able to get the safety off, and he shot Mr. Skidmore once in the head then left the room.

Q Did he say what he did then?

A He took the gun and went out into the living room, where Sonya Ballard was located, and he told me it was his intent to kill her, put the gun to her head, but she was able to move the gun away. And he never did get the gun fired to kill her.

Q Then what happened?

A At that time Mr. Decker said that he — he believed he took Sonya back to the bedroom. And his phrasing was to show her what you've been doing to me or show you the person you've been doing this with. Got back to the bedroom, saw Mr. Skidmore — yeah, correct. Mr. Skidmore

laying on the floor. And in Mr. Decker's words, it pissed him off because he was still alive. So, he took the gun, point blank, fired two more rounds or three more rounds into his head, then stepped back and emptied the gun into his head.

We conclude that this and other evidence in the record, when viewed in a light most favorable to the State, is sufficient evidence to support Decker's conviction for murder in the first degree.

SENTENCING

In his final assignment of error, Decker contends that the sentences he received on the two convictions for use of a deadly weapon in the commission of a felony were excessive. The statutory penalty range for a Class II felony is 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2000). Decker was sentenced to 40 to 50 years' imprisonment on the charge of using a firearm in the commission of a felony. The statutory penalty range for a Class III felony is a maximum of 25 years' imprisonment, a fine of $25,000, or both. *Id.* Decker was sentenced to a term of 18 to 20 years' imprisonment on the charge stemming from his use of the sword in the commission of a felony.

It is well established that an appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences. *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001); *State v. Holecek*, 260 Neb. 976, 621 N.W.2d 100 (2000). Recently, in *State v. Ruisi*, 9 Neb. App. 435, 444, 616 N.W.2d 19, 26 (2000), a majority of a Nebraska Court of Appeals panel articulated this standard of review somewhat differently, stating:

So long as a trial court's sentence is within the statutorily prescribed limits, is supported by competent evidence, and is not based on irrelevant considerations, an appellate court cannot say that the trial court has abused its discretion, because such a sentence is not untenable, does not unfairly deprive a litigant of a substantial right, and does not deny a just result.

The majority in *Ruisi* wrote further that the imposition of a sentence within the statutory limits "nearly universally means there has been no abuse of discretion." 9 Neb. App. at 444, 616

N.W.2d at 27. In his dissent, Judge Buckley disagreed with these statements for three reasons. First, he noted that the majority's position was inconsistent with the obligation of the appellate courts to review sentences pursuant to Neb. Rev. Stat. § 29-2308 (Reissue 1995), and to reduce those sentences found to be excessive. Second, he stated that the majority's interpretation of the scope of appellate review of sentences "defeats the very concept of discretion, because a sentence that exceeds its statutory authority is not an abuse of discretion, but is unlawful, null, and void." 9 Neb. App. at 452, 616 N.W.2d at 31. (Buckley, District Judge, Retired, dissenting). Finally, Judge Buckley noted that the majority's interpretation of the law "does not recognize that sentencing courts are human and fallible, and thus can impose imperfect judgments, however intended and well meaning they may be." *Id.* He concluded, "I cannot accept the majority's position. The Nebraska Supreme Court has left the door ajar—however slightly. It has not foreclosed any sentence within statutory limits from being excessive, but it strongly suggests it is a rare exception." *Id.*

The dissent in *State v. Ruisi, supra,* sets forth an accurate characterization of the law by which appellate courts must review sentences claimed to be excessive, and to the extent that the majority opinion suggests that a sentence within statutory limits can never be the product of an abuse of discretion, it is disapproved. In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Urbano,* 256 Neb. 194, 589 N.W.2d 144 (1999); *State v. Wilson,* 252 Neb. 637, 564 N.W.2d 241 (1997). Where a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed. An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result.

*State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001); *State v. Holecek*, 260 Neb. 976, 621 N.W.2d 100 (2000).

Decker was 24 years old at the time of trial and had the equivalent of a 10th or 11th grade education. According to the presentence report, he had no prior criminal convictions other than three traffic infractions in Oklahoma in 1997 and 1998. He has a history of substance abuse. Probation screening test results reflected in the presentence report include the following:

> Violent tendencies are indicated and a pattern of violence appears to be well established. This person could be dangerous to self or others. Violent behavior is characterized by ruthlessness, savageness, destructiveness and explosiveness. Substance abuse, jealousy and perceived stress could escalate into violent behavior. This client would likely be intimidating, threatening, dangerous and potentially brutal or even savage. This is a violent person. Prior violence is likely.

In pronouncing sentence, the district judge noted that Decker was not a candidate for probation or a "light sentence" because "the risk is substantial that you will engage in additional criminal conduct because of information in the presentence. You are in need of treatment that can be provided most effectively by commitment to a correctional facility. And a lesser sentence than incarceration would promote disrespect for the law."

During the sentencing hearing, the court also noted that "this was an especially cruel and brutal murder." That finding is amply supported by the record. As noted, Decker used his sword 23 times to inflict massive and mutilating cutting and stabbing wounds upon Skidmore. The heavy sword was actually bent during the attack. As Skidmore lay bleeding on the floor of his bedroom, Decker then used a pistol to fire four shots at point blank range at his head. Given the extremely violent and brutal manner in which Decker used these weapons to kill Skidmore, we certainly cannot say that imposing a sentence near the maximum statutory ranges on the two weapons charges constituted an abuse of discretion. Although it is generally within the trial court's discretion to direct that sentences imposed for separate crimes be served concurrently or consecutively, § 28-1205 does not permit such discretion in sentencing because it mandates that a sentence

for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed. *State v. Sorenson*, 247 Neb. 567, 529 N.W.2d 42 (1995).

In reviewing the sentences, however, we note that the district court allowed no credit for time served. Neb. Rev. Stat. § 83-1,106(1) (Reissue 1999), which was in effect at the time of Decker's sentencing, provides in part that "[c]redit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based." We have interpreted this statutory provision to require the sentencing judge to separately determine, state, and grant the amount of credit on the sentence to which the defendant is entitled under § 83-1,106(1). *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). See, also, *State v. Torres*, 256 Neb. 380, 383, 590 N.W.2d 184, 185 (1999) (holding that language of Neb. Rev. Stat. § 47-503 (Reissue 1998) was "functionally identical" to that of § 83-1,106(1) and required county court to separately determine, state, and grant credit for time served at time of sentencing). We have also held that when a defendant receives a sentence consecutive to a life sentence which carries a maximum and minimum term, the defendant is entitled to receive credit for the time served against the consecutive sentence. *State v. Mantich, supra.*

Here, the sentence of 18 to 20 years' imprisonment on count III, the weapons charge involving use of the sword, was pronounced as consecutive to the life sentence imposed for count I, murder in the first degree. The district court abused its discretion in failing, at the time of sentencing, to allow credit for time served against the sentence imposed on count III. Therefore, we vacate that sentence and remand the cause to the district court for resentencing in order to credit Decker with time served prior to sentencing.

## CONCLUSION

For the reasons discussed herein, Decker's convictions for murder in the first degree, assault in the third degree, use of a

deadly weapon (sword) in the commission of a felony, and use of a deadly weapon (firearm) in the commission of a felony are affirmed. The sentence on count III, involving the use of the sword in the commission of the felony, is vacated, and the cause is remanded to the district court with directions to resentence Decker on that count, giving him credit for time served.

AFFIRMED, AND SENTENCE ON COUNT III
VACATED AND REMANDED WITH DIRECTIONS.