STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLANT, V.
JOSEPH RUISI, APPELLANT AND CROSS-APPELLEE.

616 N.W.2d 19

Filed July 11, 2000.   No. A-99-382.

436

James C. Vitek and Joseph C. Vitek for appellant.

Paul D. Kratz, Omaha City Attorney, Martin J. Conboy III, Omaha City Prosecutor, and J. Michael Tesar for appellee.

SIEVERS and INBODY, Judges, and BUCKLEY, District Judge, Retired.

SIEVERS, Judge.

One of Joseph Ruisi's three dogs attacked and severely injured Paula Cork, a visitor in Ruisi's home. Ruisi was convicted in Douglas County Court on one count of harboring a dangerous and ferocious dog and on three counts of no proof of vaccination. On appeal to the district court for Douglas County, his convictions were affirmed, but his sentences were reduced. Ruisi's dog, which had been impounded since the attack, was ordered destroyed. Ruisi appeals his convictions, his sentences, the impoundment of his dog, and the destruction order. The State cross-appeals, arguing that the district court should not have reduced Ruisi's sentences.

## FACTUAL BACKGROUND

Ruisi met Cork at an Omaha bar on the night of May 14, 1998. The two talked, and during their conversation, he indicated to her that he had three dogs. His dogs include a male "Polish Ovchar," named Boksi, a female Hungarian Kuvasz, and a female Great Pyrenees. Cork told Ruisi that she was afraid of dogs. Ruisi invited Cork to his house, and they drove there together in his car. After they entered the house, Cork saw the three dogs and told Ruisi that she was afraid of them. He told her to "[s]tick by me and you'll be okay." Ruisi testified that he told her that the dogs were guard dogs and to "please leave them alone." The dogs sniffed them, but did not snap or growl. After a short while, the dogs left them alone. Although Ruisi had a basement in which he could put the dogs, and had done so before, he left them out this night.

Ruisi showed Cork around his house, and they ended up talking in a spare bedroom. Ruisi left the room to get coffee, while Cork stayed behind, sitting near the edge of the bed. One of Ruisi's dogs, Boksi, was at the foot of the bed. Cork testified that she was "just sitting there" and did not startle the dog or do anything to provoke it, but did start to reach her hand out to pet it. At that point, the dog attacked Cork. It went after her forearm first, pulled her to the floor, then bit her face and the back of her neck.

Ruisi heard Cork's screams and returned to the room. He got the dog out of the room and put him in the garage. He also got Cork something to try to stop the bleeding, then called the 911 emergency dispatch service. An emergency squad arrived shortly thereafter and took Cork to the hospital. Cork's injuries included scratches, a sinus injury, lacerations to her face and neck, and a broken nose. These injuries required over 200 stitches. Cork testified that she will have to undergo 5 years of reconstructive surgery. Cork also received mental health therapy for posttraumatic stress disorder. Since the attack, she has had nightmares and an extreme fear of dogs.

At trial, Ernest Stary, an animal control officer, testified that he arrived at Ruisi's home at approximately 2:30 a.m. on May 15, 1998. Stary stated that there were three dogs at the Ruisi residence. Ruisi told him that Boksi had bitten Cork that night. Stary asked Ruisi to provide him with proof of vaccination for the three dogs, which Ruisi did not do. Ruisi told Stary that he believed the dogs might have been vaccinated, but could not show proof of it. At trial, Ruisi admitted that Boksi was not current for his rabies vaccination on the night of May 14. He stated that he did not have the other two dogs' proof of vaccinations that night because he was staying in a temporary residence and did not have all of his paperwork at that residence. Ruisi did not produce copies of the proof of vaccinations at trial. Stary took Boksi to the humane society on May 15, where he has been impounded since.

Ruisi was cited for three counts of no proof of vaccination pursuant to Omaha Mun. Code, ch. 6, art. V, § 6-201 (1996). Ruisi was also cited for harboring a dangerous and ferocious dog, pursuant to Omaha Mun. Code, ch. 6, art. III, § 6-105 (1996), because his dog Boksi had attacked and bitten Cork.

Ruisi testified that he did not have any knowledge that any of his dogs had ever bitten or tried to bite anyone and had never attacked another animal, and that he had no reason to think that any of them would attack Cork. Ruisi does not dispute that Boksi attacked Cork and agrees that the dog inflicted the wounds that she described.

The county court found Ruisi guilty on all charges and sentenced him to 6 months in jail on the harboring a dangerous ani-

mal charge and 5 months in jail on each of the three charges for no proof of vaccination; the latter sentences were ordered to run concurrent to each other, but consecutive with the harboring sentence. The court also ordered the destruction of Bokṣi. Ruisi appealed the convictions, sentences, and destruction order to the district court, which affirmed the convictions and findings of the county court, but the district court reduced Ruisi's sentences to 6 months of probation followed by 180 days in jail, unless waived by the court, for the harboring charge and each of the three counts of no proof of vaccination, all to run concurrent with each other. Ruisi timely appealed.

## ASSIGNMENTS OF ERROR

Ruisi assigns six errors: The district court erred in (1) determining that it was not a violation of due process for the Omaha city ordinance to impose strict liability by eliminating a mens rea requirement that a dog owner know that a dog is a dangerous dog as defined in the ordinance; (2) determining that the evidence was sufficient for the county court to convict Ruisi of the offenses of harboring a dangerous dog and no proof of vaccination; (3) sentencing Ruisi to 6 months of probation followed by 6 months of imprisonment, because this exceeds the statutory limits for a violation of a misdemeanor offense; (4) failing to find that the county court order of impoundment was in violation of his due process rights under the 14th Amendment; and (5) determining that his dog should be destroyed and that he pay the expenses necessitated by the impoundment and destruction of the dog. Ruisi also asserts that his sentences are excessive.

The State has cross-appealed, asserting that the district court erred in modifying the sentences imposed by the county court.

## ANALYSIS

*Harboring Dangerous Animal as Strict Liability Crime.*

Ruisi first asserts that the strict liability nature of the harboring a dangerous dog ordinance is a violation of due process, because there is no requirement that a dog owner know that a dog is a dangerous dog as defined in the ordinance.

■ We first address whether we have jurisdiction over Ruisi's claims that the ordinance in question is unconstitutional. Neb. Rev. Stat. § 24-1106 (Reissue 1995) provides that an appeal shall be taken to "the Court of Appeals except in capital cases, cases in which life imprisonment has been imposed, and cases involving the constitutionality of a statute." Section 24-1106 does not except from the jurisdiction of this court consideration of the constitutionality of an ordinance. See, also, Neb. Ct. R. of Prac. 9E (rev. 1996). This court may determine the constitutionality of a municipal ordinance. See *State v. Champoux*, 5 Neb. App. 68, 555 N.W.2d 69 (1996).

■ Section 6-105 of the Omaha Municipal Code provides:

No person shall own, keep or harbor, or allow to be in or upon any premises occupied by him, or under his charge or control, any dangerous dog or other dangerous animal without said dog or other animal being confined so as to protect the public from injury.

A dangerous dog or other dangerous animal is defined as one who meets one or more of the following conditions:

(a) Any dog or other animal which attacks a human being or other domestic animal one or more times, without provocation;

(b) Any dog or other animal with a history, tendency or disposition to attack, to cause injury or to otherwise endanger the safety of human beings or other domestic animals;

(c) Any dog or other animal that snaps, bites or manifests a disposition to snap or bite.

If upon the conviction of an offense under this section it shall appear to the court that said dog or other animal is still living, the court may, in addition to any other fine or judgment, order the poundmaster to forthwith put the dog or other animal to death by removing the same to the animal shelter for such purpose. Any person found guilty of violating this section shall pay all expenses, including shelter, food, veterinary expenses for identification or certification of the dog or other animal, boarding and veterinary expenses necessitated by the seizure of any dog or other animal for the protection of the public and such other

expenses as may be required for the destruction of any such dog or other animal.

In *State v. Pettit*, 233 Neb. 436, 447, 445 N.W.2d 890, 897 (1989), *overruled on other grounds, State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994), the Nebraska Supreme Court stated: " 'Strict liability offenses are the exception rather than the rule and will only be found where there is a clear legislative intent not to require any degree of mens rea.' " Accord *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989). However, the court went on to state that the violation of some criminal statutes may occur without a defendant's criminal intent, if such law

"omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where the conviction does not gravely besmirch, where the statutory crime is not taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause."

*Pettit*, 233 Neb. at 447, 445 N.W.2d at 898, quoting *Holdridge v. United States*, 282 F.2d 302 (8th Cir. 1960). Thus, contrary to Ruisi's assertion, there are many laws and ordinances that are "strict liability" in nature. For example, most traffic laws contain no criminal intent element.

The argument being advanced, "I did not know my dog was dangerous because he had never attacked anyone before," is not dissimilar to the argument made in statutory rape cases that "I did not know how young she was." That defense, which is fundamentally a lack of intent argument, like that advanced here, has been uniformly rejected. See *State v. Navarrete*, 221 Neb. 171, 376 N.W.2d 8 (1985) (defense of reasonable mistake in prosecution for sexual assault of child is not constitutionally required).

While there are no cases regarding the specific ordinance at issue, cases regarding Nebraska's civil dog bite statute are instructive. In *Holden v. Schwer*, 242 Neb. 389, 495 N.W.2d 269 (1993), the court reiterated that Nebraska's dog bite statute,

Neb. Rev. Stat. § 54-601 (Reissue 1998), is based on strict liability. That statute provides in part that "the owner or owners of any dog or dogs shall be liable for any and all damages that may accrue (1) to any person, other than a trespasser, by reason of having been bitten by any such dog or dogs." The court in *Holden* stated: "Section 54-601 has been applied a number of times by this court and has been found to make an owner strictly liable for injuries inflicted by his dog without any proof that the owner knew of the dog's dangerous propensities." 242 Neb. at 392, 495 N.W.2d at 271. See, also, *Guzman v. Barth*, 250 Neb. 763, 552 N.W.2d 299 (1996); *McCullough v. Bozarth*, 232 Neb. 714, 442 N.W.2d 201 (1989); *Paulsen v. Courtney*, 202 Neb. 791, 277 N.W.2d 233 (1979). In *Donner v. Plymate*, 193 Neb. 647, 650, 228 N.W.2d 612, 614 (1975), the court stated: "Dog owners are statutorily liable for any and all damage without proof of scienter or knowledge of dangerous propensities of their dog for biting . . . persons." Referring to this language, the court in *Paulsen*, 202 Neb. at 795, 277 N.W.2d at 235, found: "It is, therefore, beyond question that section 54-601, R. R. S. 1943, creates a cause of action based upon strict liability on the part of a dog owner."

While § 54-601 applies to civil actions and the present case involves a criminal ordinance, the statute and the resulting case law support the notion that the public policy of the State is that dog owners are held to a very high standard in order to protect the public from injury by dogs. The mere fact that a dog has bitten someone who is not a trespasser is enough to impose liability on the dog's owner for the full range of personal injury damages caused by the dog. We find that the same public policy is carried through in Omaha's criminal "harboring" ordinance as there is no express provision for prior knowledge or criminal intent.

To find in the ordinance a mens rea requirement of criminal intent, or even a requirement of negligence on the part of the dog owner, would defeat the ordinance's public policy, which is to protect people from the great harm which can befall a victim of a dog attack. In short, under the Omaha ordinance, no dog (or dog owner) is entitled to "one free bite." We construe the city council's intent and purpose in enacting the ordinance as pro-

tection of the public without any need to show criminal intent. In fact, we believe that in promulgating such ordinance, the city council was attempting to address exactly what occurred in this case. In addition, violation of the ordinance is a misdemeanor, thus limiting the penalty which can be imposed.

■ We hold that the Omaha ordinance against harboring a dangerous dog does not violate the constitutional requirements of due process merely because it is a "strict liability" crime. Proof of prior knowledge that the dog had dangerous propensities is not required, nor is proof of any criminal intent required.

*Sufficiency of Evidence—Harboring Conviction.*

■ Ruisi argues that the evidence was insufficient to support his conviction for harboring a dangerous dog. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, and if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction, the appellate court will affirm. *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998); *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998). The trial court's findings have the effect of a jury verdict and will not be set aside unless clearly erroneous. *State v. Blackman*, 254 Neb. 941, 580 N.W.2d 546 (1998).

There is no conflict in the evidence that Ruisi's dog attacked and injured Cork. Ruisi argues that Cork provoked the dog, but reaching one's hand out intending to pet a dog does not constitute "provocation," particularly when we view the evidence most favorably to the State. There is no other evidence that Cork provoked the dog into attacking her. Having found the ordinance constitutional, negating the need that the State prove criminal intent, we find that the evidence is obviously sufficient to sustain Ruisi's conviction for harboring a dangerous dog.

*Excessive Sentence on Harboring Conviction.*

Ruisi argues that his sentence of 6 months' incarceration on the harboring charge is excessive. On appeal to the district court, that court reduced and modified Ruisi's sentence to 6 months of probation followed by 180 days of imprisonment, unless waived

by the court. The State asserts in its cross-appeal that the district court should not have reduced Ruisi's sentence. See *State v. Turco*, 6 Neb. App. 725, 576 N.W.2d 847 (1998) (cross-appeal by State proper from alleged error by district court in its review of county court conviction and sentence).

So long as a trial court's sentence is within the statutorily prescribed limits, is supported by competent evidence, and is not based on irrelevant considerations, an appellate court cannot say that the trial court has abused its discretion, because such a sentence is not untenable, does not unfairly deprive a litigant of a substantial right, and does not deny a just result. *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999). In *State v. Hopkins*, 7 Neb. App. 895, 587 N.W.2d 408 (1998), we considered the reduction by the district court of a lawful sentence imposed within the statutory limits by a county court. We held that in such instance, the district court acts as an appellate court and has no greater power of sentence review than does an appellate court of a district court's sentences. Thus, as the sentence pronounced by the county court was within statutory limits, which nearly universally means there has been no abuse of discretion, we reversed the district court's reduction of sentence in *Hopkins, supra.* In *Hopkins*, we said that "an appellate court, including a district court reviewing a county court sentence, has an extremely limited review of sentences, and sentences within statutory limits are uniformly and routinely affirmed despite the appellate court's opinion of the sentence." 7 Neb. App. at 901, 587 N.W.2d at 413. It is now quite clear that this is the law of Nebraska.

In the instant case, the district court reasoned that "without evidence of a prior attack or biting incident and no evidence of a history or tendency of the dog to be violent that the sentence imposed upon the Defendant was excessive and constituted an abuse of discretion by the trial court and should be modified." While these could well be important considerations for the sentencing court, precedent dictates they are not meaningful for the reviewing court, which generally looks only at whether the sentence is within statutory limits. See *Harrison, supra.* Although the trial court sentenced Ruisi to the maximum term allowed, the sentence for harboring a dangerous dog charge was still

within the limits prescribed by the ordinance. The trial court's original sentence is also supported by competent evidence, including the severe nature of Cork's injuries and the lack of care exhibited by Ruisi in not putting the dogs in the garage or basement to protect Cork, when he knew she was afraid of the dogs. These are relevant factors to consider. Applying the law from *Hopkins, supra,* and *Harrison, supra,* we hold that the trial court did not abuse its discretion in sentencing Ruisi to 6 months in jail for the harboring charge. We therefore reverse the district court's sentence and reinstate the county court's sentence of 6 months on the harboring charge.

*No Proof of Vaccination Conviction.*

Ruisi was charged with and convicted of three counts of no proof of vaccination, an ordinance found in § 6-201 of the Omaha Municipal Code. The trial court sentenced him to 5 months in jail on each charge, with the sentences to run concurrent to each other and consecutive to the harboring sentence. On appeal, the district court reduced his sentences to 6 months of probation followed by a term of incarceration of 180 days, unless waived by the court, on each count, to run concurrent to each other and to the reduced harboring sentence. Ruisi asserts that the evidence was not sufficient to sustain his convictions and that his sentences were excessive.

At trial, Ruisi failed to offer the ordinance concerning failure to provide proof of vaccination, and it is not in the record before us. See *State v. Bush,* 254 Neb. 260, 576 N.W.2d 177 (1998) (holding that appellate court will consider ordinances if offered as evidence at trial level or if included in appellate court's transcript). Usually, when a defendant appeals a conviction and sentence under a municipal ordinance, claiming insufficiency of the evidence and excessiveness of the sentence, an appellate court's consideration of the assignments of error requires examination of the specific ordinance involved. Before *Bush, supra,* the rule was that an appellate court would not take judicial notice of an ordinance not in the record but assumed that a valid ordinance creating the offense charged existed, that the evidence sustained the findings of the trial court, and that the sentence was within the limits set by the ordinance. *State v. Hill,*

254 Neb. 460, 577 N.W.2d 259 (1998); *State v. Buescher*, 240 Neb. 908, 485 N.W.2d 192 (1992); *State v. King*, 239 Neb. 853, 479 N.W.2d 125 (1992). This is known as the "ordinance rule" and normally disposes of an appeal when the record does not contain the applicable city ordinance. *Bush* clearly teaches that the ordinances and the sufficiency of the evidence to sustain a conviction thereunder can be considered if the ordinance is in our transcript—which the *Bush* court points out is merely a matter of the appellant requesting, via a praecipe, that the county court clerk include the ordinance in the transcript. As explained in *King*, 239 Neb. at 854, 479 N.W.2d at 126, "In the absence from the record of the applicable municipal ordinance, an appellate court *presumes that the evidence sustains the findings of the trial court.*" (Emphasis supplied.)

Because the pertinent ordinance is not in the record or in our transcript, we apply the ordinance rule. Therefore, we must assume the evidence is sufficient to sustain Ruisi's convictions and that the sentences imposed by the trial court are within the limits set by the ordinance. Accordingly, Ruisi's assignment of error regarding the sufficiency of the evidence and the excessiveness of his sentences on the charges of no proof of vaccination is without merit.

With regard to the State's cross-appeal regarding the reduction of Ruisi's county court's sentences for these offenses by the district court, we apply the same principles from *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999), and *State v. Hopkins*, 7 Neb. App. 895, 587 N.W.2d 408 (1998), as we did with respect to the district court's reduction of the sentence for harboring a dangerous dog. Under the ordinance rule, we presume that the county court's sentence is within the limits set by the ordinance. Therefore, we reinstate the county court's sentences of 5 months in jail on each of the three counts to run concurrent to each other, but consecutively to the sentence on the harboring conviction.

### Impoundment and Destruction of Dog.

With regard to the disposition of the dog, Ruisi raises two arguments. Ruisi first argues that his dog should not have been impounded. The dog was originally impounded on May 15,

1998, for a 10-day observation period pursuant to an ordinance because Ruisi could not show proof of vaccination, and then on May 19, the court ordered the dog held until the proceedings were complete. We do not have the 10-day observation ordinance in the record, and therefore we apply the ordinance rule, which means that we must find that the impoundment was lawful and fully in accord with the ordinance.

Moreover, we find that the action of the court in ordering the impoundment of the dog was in accordance with § 6-106, which specifically provides that the court may order the impoundment of a dangerous dog under § 6-105 during the pendency of enforcement proceedings. Furthermore, we cannot conclude that the impoundment of the dog violated any due process rights of Ruisi since we do not have the ordinance, but under the ordinance rule, we presume its validity—including adequate notice and an opportunity to be heard. See *State v. Crowdell*, 234 Neb. 469, 451 N.W.2d 695 (1990) (where penal statute supplies adequate and fair notice of conduct prohibited and also supplies explicit definition of proscribed conduct, due process is satisfied).

Second, Ruisi argues that the dog should not be destroyed and that he should not be made to pay the expenses necessitated by the impoundment and destruction of the dog. Section 6-105, which we have in the record and which we have previously quoted, clearly provides that the court may order such destruction and that the person convicted of harboring the dangerous animal shall pay the expenses. Because we have affirmed the conviction for harboring a dangerous dog, it naturally follows that we would affirm the destruction of the dog, at Ruisi's cost, as the ordinance provides, unless we were to find merit in Ruisi's due process argument.

*Due Process.*

The dog was impounded on May 15, 1998, pursuant to § 6-205 of the Omaha Municipal Code for a 10-day rabies observation period. On May 19, 1998, the county court placed a hold on the dog during the pendency of Ruisi's case, pursuant to § 6-106 of the code. On July 6, 1998, Ruisi filed a motion for the release of the dog, which was heard and denied by the court on July 30, 1998.

The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process present a question of law. *Billups v. Nebraska Dept. of Corr. Servs. Appeals Bd.*, 238 Neb. 39, 469 N.W.2d 120 (1991).

Procedural due process limits the ability of the government to deprive people of interests which constitute "liberty" or "property" interests within the meaning of the Due Process Clause and requires that parties deprived of such interests be provided adequate notice and an opportunity to be heard. *Shearer v. Leuenberger*, 256 Neb. 566, 591 N.W.2d 762 (1999) (Connolly, J., concurring). The protections of procedural due process attach whenever there has been a deprivation of a significant property interest. *Blanchard v. City of Ralston*, 251 Neb. 706, 559 N.W.2d 735 (1997). When examining a claim that one is being deprived of a property interest without due process of law, a three-stage analysis is employed. See *Shearer, supra.* The question at the first stage is whether there is a protected liberty interest at stake. *Id.* If so, the analysis proceeds to the second stage, in which it is determined what procedural protections are required. *Id.* Upon the resolution of that issue, the analysis moves on to the third and final stage, in which the facts of the case are examined to ascertain whether there was a denial of that process which is due. *Id.*

In *Shearer, supra*, Justice Connolly stated in his concurrence:
However, "[w]e tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in ' "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." ' " *United States v. James Daniel Good Real Property*, 510 U.S. at 53, quoting *Fuentes v. Shevin*, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). See, also, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982) (noting that postdeprivation process may be sufficient when state must necessarily act quickly or it is impractical to provide predeprivation process). Whether such an exception applies requires an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings. *United*

*States v. James Daniel Good Real Property, supra.* In this regard, we consider (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*; *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

256 Neb. at 592-93, 591 N.W.2d at 777-78.

*Property Interest.*

Ruisi's property interest in the dog, while it exists, is minimal. At the time the dog was taken away, Ruisi lived in a home in Omaha and worked at Peter Kiewit and Sons. The record shows that he apparently has quit that job and is now a sheep farmer. While he contends that he needs the dog to guard his sheep, he owns two other dogs beside the one at issue. Moreover, Ruisi has not even shown that the dog is capable of guarding sheep. Thus, we concede that Ruisi has some property interest in the dog, but we have difficulty on this record in saying that the interest is "substantial."

*Risk of Erroneous Deprivation.*

There is little risk of erroneously depriving Ruisi of his property interest in the dog because even Ruisi does not dispute that the dog inflicted the injuries on Cork, which obviously were significant. There is no risk here that the dog to be destroyed is "innocent" or is not dangerous.

*City's Interest.*

The city has a significant interest in removing from circulation a dog that has attacked and seriously injured a person without any provocation. The dog presents a danger to society, and the city has a legitimate interest in protecting the public from the animal.

*Balancing.*

We cannot say that Ruisi's property interest in the dog outweighs the city's interest in keeping this harmful animal from

the public. The monetary value of the dog is minimal, and even if it has value as a guard dog for Ruisi's sheep, a factual assertion not proved by the record, we cannot say that such assumed value outweighs the need for protection of the public. In addition, a person cannot be said to be deprived of his property without due process of law so long as he has recourse to the courts for the protection of his rights. *Howard v. City of Lincoln*, 243 Neb. 5, 497 N.W.2d 53 (1993); *Dawson County Irrigation Co. v. McMullen*, 120 Neb. 245, 231 N.W. 840 (1930). See, also, *Koepp v. Jensen*, 230 Neb. 489, 432 N.W.2d 237 (1988). Ruisi had such recourse through legal means, but has failed to convince the county court, the district court, or this court that the dog was not dangerous and should not be destroyed.

In conclusion, we find no denial of due process in the order for destruction of the dog. As far as the order that Ruisi pay the costs of the dog's impoundment and destruction, the ordinance so provides. Such costs are merely part of the owner's responsibility when keeping a large dog which turns out to be a dangerous animal that must be destroyed. These are costs which society legitimately imposed on Ruisi.

## CONCLUSION

We find that the ordinance prohibiting the harboring of a dangerous dog is constitutional and that the evidence was sufficient to support the conviction thereunder. We also find that Ruisi has not shown that the evidence was insufficient on the three convictions for no proof of vaccination. We reverse the district court's reduction of Ruisi's sentences and reinstate the trial court's sentence of 6 months on the harboring a dangerous dog conviction and 5 months in jail on each count of no proof of vaccination to run concurrent to each other, but consecutively with the 6-month sentence on the harboring charge. In addition, there was no violation of Ruisi's due process in the impoundment of the dog or in the order that the dog be destroyed. Pursuant to § 6-105, we find no error in ordering Ruisi to pay the expenses necessitated by the impoundment and destruction of the dog.

AFFIRMED IN PART, AND IN PART REVERSED.

Buckley, District Judge, Retired, dissenting.

I respectfully dissent from that portion of the opinion of the majority that the county court's sentences were not excessive and, therefore, not an abuse of discretion. The district court, in appellate review, said they were excessive. I agree.

An abuse of discretion "takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result." *State v. Philipps*, 242 Neb. 894, 898, 496 N.W.2d 874, 877 (1993).

The majority states that "[s]o long as a trial court's sentence is within the statutorily prescribed limits, is supported by competent evidence, and is not based on irrelevant considerations, an appellate court cannot say that the trial court has abused its discretion . . . ." Citing *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999). What is meant by "supported by competent evidence" is far from clear. The majority goes on to say that a sentence pronounced within statutory limits nearly universally means that there has been no abuse of discretion and that sentences within statutory limits are " 'uniformly and routinely affirmed despite the appellate court's opinion of the sentence.' " Quoting *State v. Hopkins*, 7 Neb. App. 895, 587 N.W.2d 408 (1998). The majority then concludes: "It is now quite clear that this is the law of Nebraska."

The above statement is understandable when one considers that in the 8 years of the existence of the Nebraska Court of Appeals, not a single criminal sentence has met the definition of abuse of discretion set forth in *Philipps, supra.*

This may seem to lead the majority to the conclusion that limitations such as "supported by competent evidence" and "nearly universally" are virtually meaningless and that therefore any sentence—without exception—that is within statutory limits is not an abuse of discretion and thus not excessive.

The problem with such a position is threefold. First, it is inconsistent with, and renders empty, the words of Neb. Rev. Stat. § 29-2308 (Reissue 1995), which states in part:

> In all criminal cases that now are or may hereafter be pending in the Court of Appeals or Supreme Court, the appellate court may reduce the sentence rendered by the district court against the accused when in its opinion the

> sentence is excessive, and it shall be the duty of the appellate court to render such sentence against the accused as in its opinion may be warranted by the evidence.

Second, it defeats the very concept of discretion, because a sentence that exceeds its statutory authority is not an abuse of discretion, but is unlawful, null, and void.

Third, it does not recognize that sentencing courts are human and fallible, and thus can impose imperfect judgments, however intended and well meaning they may be.

I cannot accept the majority's position. The Nebraska Supreme Court has left the door ajar—however slightly. It has not foreclosed any sentence within statutory limits from being excessive, but it strongly suggests it is a rare exception. This case indeed is one of those rare exceptions.

In determining an appropriate sentence, the court must consider in each case the offense and the offender. The majority dismisses the district court's reasons for adjudging the sentences excessive as not meaningful if the sentence is within statutory limits, but then goes on to recognize the severe injury to Cork and the lack of care of Ruisi to protect Cork (notwithstanding there was no evidence that the dog would bite) as relevant factors to consider. I disagree that the district court's reasons were irrelevant.

All four of the offenses are city ordinance misdemeanor violations. No proof of vaccination of a dog is tantamount to no proof of a valid driver's license or failure to carry one's insurance card in one's automobile. Regardless of whether the required proof is furnished by the time of sentence, to send a defendant to jail at all, let alone the maximum, is unheard of. While the dog caused a serious injury to Cork, the fact that there was no evidence that the dog had ever bitten anyone before or had any kind of propensity to bite is more relevant than the result of the bite to the nature of the offense.

Ruisi has no prior criminal record. While harboring a dangerous dog requires no criminal intent or guilty knowledge as elements of the crime, the fact that Ruisi had no such intent and had no knowledge or reason to know that the dog would bite are facts which are significant considerations in the sentence.

Eleven months in jail for four misdemeanors, the maximum allowed by law, none requiring criminal intent, enforced upon a first time offender of any kind are excessive sentences and an abuse of discretion by any definition.