STATE OF NEBRASKA, APPELLEE, V.
CHARLENE M. OLDENBURG, APPELLANT.
628 N.W. 2d 278

Filed April 24, 2001.   No. A-99-504.

David E. Veath for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HANNON, INBODY, and MOORE, Judges.

PER CURIAM.

## I. INTRODUCTION

The defendant, Charlene M. Oldenburg, was charged with making a terroristic threat in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 1995), with first degree assault under Neb. Rev. Stat. § 28-308 (Reissue 1995), and with the use of a deadly weapon in the commission of both of those crimes under Neb. Rev. Stat. § 28-1205 (Reissue 1995). The charges resulted from an incident where Charlene pointed a gun at her husband, he charged her, and while doing so, he was shot and very seriously injured. Charlene was found not guilty of first degree assault and guilty of the other two crimes. She was sentenced to 2 to 5 years' imprisonment for the terroristic threats conviction and to 2 to 15 years' imprisonment for the use of a weapon conviction, with the sentences running consecutively. Charlene appeals, alleging that the trial court erred in imposing excessive sentences. We conclude that in this case, the sentences were an abuse of discretion. Accordingly, we reduce the sentences.

## II. SUMMARY OF EVIDENCE

### 1. TRIAL

Kurt Oldenburg and Charlene were married in 1982 and resided on a farm near Gordon, Nebraska, throughout their marriage. The Oldenburgs have two children: KayCee, age 15, and Kerry, age 10, at the time of the trial. The evidence shows that

the Oldenburgs had a fairly normal marriage during the first 5 years that they were married, but then the marriage began to deteriorate. For various disputed reasons, they became abusive toward each other. Kurt is an admitted alcoholic. He testified that Charlene had a violent temper and was very volatile and that on one occasion after he spanked her, she stated, "If you ever do that again I'll shoot you." The evidence details a stormy relationship of mutual marital infidelity, mutual use of marijuana, and mutual tormenting in ways many people would find abusive. Most of this evidence is not to the credit of either Kurt or Charlene.

Kurt testified that on July 29, 1998, he began drinking around 9 to 10 p.m. while in Gordon. He drank at various places in Gordon and was in a "black out" stage from the alcohol by the time he left for home at approximately 1 a.m. on July 30. He testified that he did not remember driving home or entering his house that night and that the first thing he remembered was having a "scuffle" with Charlene. He did not remember the details of the scuffle, only that there was "antagonism." The other evidence of the events leading up to the shooting comes from Charlene and the children.

Charlene testified that on July 29, 1998, she arrived at home at approximately 10 p.m. with the children. She watched a movie with them and went to bed at approximately 1 a.m. Kerry, who was 9 years old at that time, slept with her because he was afraid after watching the movie. Charlene testified that the next thing she remembered was that the bedroom light came on and that Kurt was standing in the bedroom. She testified that she told Kurt that they would have to move Kerry. Kurt told her to "speak up," and the dog started barking. Charlene testified that Kurt then grabbed the dog and "squeezed" it. She got up and asked Kurt to not hurt the dog, and he threw the dog out the front door (which was nearby) and then pushed Charlene down to the floor. She stated that Kurt was very drunk and that she skidded across the floor. She testified that she then got up and stated that she was going to call the 911 emergency dispatch service. She tried to reach for the telephone, but Kurt grabbed both of her arms and shook her several times. He then let go of her, and she fell to the floor again. She testified that Kurt kicked her in the back

with his boot while she was on the floor and that she was very scared of him at that point. Charlene stated that Kurt then walked out the front door, and she went back to bed. The record contains several pictures of a bruise on Charlene's back.

Charlene's version of the facts is largely corroborated by Kerry. He testified that he was awakened by the dog's barking and that he saw Kurt squeeze the dog and put her outside. He testified that Charlene said something like, "Don't hurt the dog." Kerry stated that he was out of bed at that point and saw Kurt kick Charlene hard and that he was scared. He stated that he remembered Charlene's saying that she was going to call 911 and that then Kurt walked away. Kerry testified that then he went back to bed and that so did Charlene.

Charlene testified that when she got back into bed, she grabbed a .22-caliber revolver from behind the headboard. She could hear Kurt coming back into the house, and she asked Kerry how to unload the gun because she wanted to unload it if it was loaded. Charlene testified that she and Kerry attempted to, but did not, get the gun open.

Kerry testified that when Charlene came back to bed, she reached over him and got a gun out of the headboard. He stated that she seemed afraid and that she asked him how to unload the gun. They tried unsuccessfully to unload the gun, but then Kurt came back into the bedroom.

KayCee, the parties' 15-year-old daughter, testified that she slept in the basement on the night of July 29, 1998, and therefore did not see the events before the shooting, but that she did hear the dog yelping very loudly just before she heard the gunshots.

Kurt testified that his recollection of the events of that night first became clear when he walked into the bedroom after the "scuffle" with Charlene. Things became "crystal clear" and "lucid" at that point because Charlene was pointing the revolver at him. He stated that Charlene was holding the gun with her right hand only and that Kerry was sitting on the bed next to her. Kurt testified that Charlene was sitting in the middle of the bed and stated, "If you come into this room I'll shoot you." Kurt testified that he was "just incensed" that Charlene was pointing a gun at him in his own house. He stated that he then "launched [himself] toward the gun" and that because of his intoxication

and the earlier dispute, he just wanted to get the gun from her. Kurt testified that he was drunk and that his "judgment was off." He stuck his hands out and lunged at Charlene to get the gun. But Charlene then lowered her arm and put the gun down to her right side, and he missed the gun. Kurt then tried to pin her arm down against the bed, but he was only able to pin down the biceps area of her arm. Kurt testified that Charlene then raised the gun with only her forearm while her upper arm was pinned down and shot him. Kurt testified that he felt the barrel of the gun on his neck, that Charlene pulled the trigger, that he never touched Charlene's hands or the gun, and that the bullet struck him in the neck and caused serious spinal cord damage and paralysis.

Charlene testified that when Kurt came back to the bedroom door, she "swung towards the door" and pointed the gun at him to keep him away from her and Kerry. She testified that she said something to the effect of, "Don't come any closer," but that she did not state that she was going to shoot him. Kurt then lunged toward her, but she moved her arm to her right side to try to get the gun out of the way. She testified that Kurt then grabbed her arm and stopped it and that as he was coming at her, the "gun went off." Charlene stated that she did not recall pulling the trigger, that she did not know whether the gun was loaded, and that she did not intend to shoot Kurt.

Kerry testified that when Kurt returned to the bedroom, Charlene "held the gun up" and that he was very scared. He stated that Charlene said, "Don't come any closer. Don't take another step," and that Kurt lunged at her. Kerry testified that Charlene tried to move the gun away to her right side, and then the gun went off. He testified that Kurt was on top of Charlene and on her arm and had ahold of the gun and her arm. He stated that he did not see Charlene cock the hammer of the gun or pull the trigger.

Kurt was seriously injured and disabled, and undisputably suffered serious personal injury from the bullet. The examining physician testified that Kurt had a gunshot wound in the left side of his neck at the base of the skull, posteriorly. The doctor testified that the bullet went down toward the cervical spine and then went off to the right side of the chest posteriorly. An x ray showed the bullet lying over Kurt's right shoulder blade. After

the shooting, Charlene called 911 and a friend, and in due time, police arrived at the home. She admitted to the police that she shot Kurt.

Theresa Blausey from the Nebraska State Patrol testified that she interviewed Charlene on July 30, 1998, and that Charlene admitted that she had retrieved the gun from behind the bed in order to scare Kurt and keep him from coming into the room. She testified that Charlene reported the incident where Kurt had spanked her and that Charlene stated she told Kurt then that "he'd better never do that again or else." Blausey further testified that Charlene reported that as Kurt approached the bedroom, she told him "[j]ust not to come in, or, Don't come in or I'll shoot, or, Stay back; that type of verbiage." Charlene further reported to Blausey that subconsciously, she probably intended to shoot Kurt and that she knew all the guns in the house were loaded. Blausey further testified that Charlene stated that she wished Kurt would "just vaporize." Blausey admitted on cross-examination that she had initially suggested to Charlene that maybe Charlene could have possibly subconsciously desired to shoot Kurt and that she asked Charlene more than once if she had ever thought about killing Kurt before Charlene admitted that she might have thought of killing him.

During the State's case in chief and at other points in the trial, the State was allowed to introduce evidence of Charlene's adultery. Kurt testified over objection that Charlene had an affair and repeatedly testified without objection to the details of Charlene's affair. Kurt also admitted to infidelity. Charlene testified just before the end of the trial. On cross-examination, the State was allowed to extensively question her about several meetings that she had had with her boyfriend since the shooting and about the fact that she had seen him in violation of a previous order from the judge. Charlene's attorney objected occasionally during her cross-examination.

The jury was instructed on the elements of the crime of felonious assault, but no self-defense instruction was given for that crime. The jury was also instructed on the elements of terroristic threats, and a self-defense instruction was given for that crime. It was also instructed on the elements of using a firearm to commit a felony in connection with both of the other alleged

crimes. The jury found Charlene not guilty of first degree assault, guilty of making a terroristic threat, and guilty of using a gun to commit a felony.

## 2. SENTENCING

### (a) Presentence Report

Charlene was sentenced on April 6, 1999, and was 48 years old at the time of sentencing. The 20-page presentence report (PSR) shows that Charlene attended school to the 11th grade, entered the Army National Guard in 1981, and was honorably discharged in 1987. She married for the first time when she was young and had a child who is now an adult. After getting divorced from her first husband, she met and married Kurt.

The PSR shows that Charlene's criminal record contained only traffic offenses, although she admitted to having been arrested 27 years earlier for possession of marijuana in California. She admitted that more recently, she had smoked one "joint" of marijuana once or twice a week, which she thought helped overcome her premenstrual syndrome. She also stated that she drank alcohol on a social basis. Scores from testing for intensive supervision probation indicated that Charlene needed mandatory chemical dependency treatment. The PSR shows that Charlene's health is good and that the examining psychologist does not see her as a threat to herself, her family, or the community.

The PSR also gives a lengthy summary of the evidence and possible evidence, including the effect of the shooting on Kurt. It shows that the children were close to Charlene and would be damaged by removing her from them. It is evident from their letters that the children viewed Charlene as the victim in this case. There are no letters that are not in Charlene's favor. The PSR also contains letters from domestic violence organizations asking for leniency upon the basis of the domestic abuse involved. The PSR also contains many letters from family, friends, and professional persons essentially asking that Charlene be given probation.

In the summary section of the PSR, the probation officer notes that Kurt will suffer a lifetime of pain and paralysis and that his medical expenses already total $76,000 and are still being incurred at the rate of $5,000 per month. The officer also

notes that "Charlene did not call 911 after she was thrown on the floor and kicked by [Kurt]" on the night of the shooting.

The probation officer goes on to say that Charlene "could have made a different choice, years ago." The officer then mentions Charlene's marijuana usage and her extramarital affair with "a man who assaulted her in her own home." The officer states: "Charlene not only placed her life in danger, but her childrens' [sic] as well. I do not recommend probation. I believe a sentence to probation would promote disrespect for the law and depreciate the seriousness of the offense."

### (b) Counsel's Arguments

At the sentencing hearing, defense counsel argued that the PSR incorrectly focused on Kurt's injuries and that under the statutory criteria in Neb. Rev. Stat. § 29-2260 (Reissue 1995), Charlene should be considered for probation. Defense counsel also argued that the PSR focused on a crime which she was found not guilty of by the jury.

The prosecutor argued that under § 29-2260, sentences of less than 8 to 12 years' imprisonment would depreciate the seriousness of the offenses and promote disrespect for the law. He argued that the jury did not accept Charlene's self-defense argument and that there was a violent and serious incident with medical bills totaling $76,000 which would increase at the rate of $5,000 per month, and he asked for restitution. He accused Charlene of lying under oath when she stated that she was protecting the children and argued that one child was untruthful on the stand. He encouraged the court to disregard the battered wife argument because it was turned down by the jury. He mentioned Charlene's affair and argued that she escalated the confrontation with Kurt by getting the gun.

### (c) Judge's Comments

Immediately prior to imposing the sentences, the judge stated that there was no way of determining what the jury was actually doing when it brought back its verdicts and that he wished he could ask the jury for particulars, but that it was likely that the verdicts were a compromise. The judge stated that probably some jurors believed that Kurt got what he

deserved, that others believed that Charlene deserved the "max," and that they may have compromised somewhere in the middle. He also recognized that some jurors may have believed that Charlene did not intend to shoot Kurt, but that she "had no business whipping out the gun and she whipped out the gun and that's why somebody was hurt." The judge indicated that our "system" required him to impose the sentences after giving due credence to arguments of counsel, the PSR, and, in some cases, the victim's statement.

The judge observed that "[n]obody's all right and nobody's all wrong." He further stated:

> What's important is that there are other people out there . . . similarly situated who need to know that when violence occurs, particularly deadly weapon violence occurs, the system takes note and the system does something about it.
>
> . . . And if with incredible incidents of violence such as this one is . . . the Court doesn't impose a proper sentence, people do not feel safe. They feel that the authorities have abandoned them, the system of criminal justice doesn't care about doing its job, and they hold the system up to ridicule and the law is brought low.

The judge also stated that he did not believe Charlene would abide by probation. He stated: "As I recall, the Court more or less looked you in the eye and said, Don't have anything to do with this guy that beat you up, was your boyfriend." The court stated that Charlene more or less agreed but then saw the boyfriend on at least one occasion, and then lied about it under oath. The court continued: "Can you do these things in direct contravention of the Court order, then lie about it and have it just passed off? Can't happen."

The judge then computed the two sentences more or less out loud and gave her credit for the 34 days she had already spent in jail. The court sentenced her to 2 to 5 years' imprisonment for the terroristic threats conviction and 2 to 15 years' imprisonment for the use of a deadly weapon conviction. In his truth in sentencing statement, the judge stated that Charlene would not be eligible for parole until she had served 2 years in prison.

The court denied restitution because "the amount is in dispute, has not been proved, and it's a good suggestion that it will

wait for the civil case that's coming." The court refused to let Charlene out of jail on bond during the appeal.

## III. ASSIGNMENT OF ERROR

Charlene alleges that the trial court erred in imposing an excessive sentence.

## IV. STANDARD OF REVIEW

It is well established that an appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001); *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001); *State v. Holecek*, 260 Neb. 976, 621 N.W.2d 100 (2000). In *Decker*, the court stated:

> Where a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors [quoted below] as well as any applicable legal principles in determining the sentence to be imposed. An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result.

261 Neb. at 398, 622 N.W.2d at 917. The *Decker* court also restated the considerations which were to be used in sentencing and examined the facts in *Decker* under those considerations. We shall quote these considerations below when we apply them to the facts in this case.

## V. ANALYSIS

Charlene argues that the trial court did not consider "all pertinent circumstances" and therefore imposed excessive sentences. Brief for appellant at 12. As an initial matter, we note that the statutory penalty range for the use of a weapon in commission of a felony, a Class II felony, is 1 to 50 years' imprisonment, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2000), and that the statutory penalty range for terroristic threats, a Class IV felony, is 0 to 5 years' imprisonment, a $10,000 fine, or both. *Id.* Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2000) provides that the

minimum sentence for a Class IV felony "shall not be . . . more than one-third of the maximum term and the maximum limit shall not be greater than the maximum provided by law." Therefore, the minimum sentence imposed for Charlene's terroristic threats conviction could be no more than 20 months. The court's sentence of 2 to 5 years' imprisonment on the terroristic threats conviction was plain error. We do not discuss this further, as we modify Charlene's sentences later in this opinion. Before considering the evidence relative to the crime, we will first consider the effect of the jury verdicts on judging the events for purposes of determining the correct sentences.

## 1. EFFECT OF JURY VERDICTS ON SENTENCES

In this case, the jury verdict has two aspects. The defense argued that the court should ignore the shooting when considering the other sentences because of the not guilty verdict, and similarly, the State argued that the court should not consider Charlene's self-defense and battered wife arguments because the jury rejected those defenses by finding her guilty of the terroristic threats charge. We therefore must consider the effect of these verdicts in considering appropriate sentences. We find no Nebraska cases which have considered these issues, but the sentencing guidelines have caused federal courts to consider both of these issues.

In *United States v. Watts*, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997), the U.S. Supreme Court held that a sentencing court can consider conduct of the defendant for which the defendant was acquitted as long as that conduct was proved by a preponderance of the evidence. The *Watts* court based its decision upon the widely held rule that a sentencing court may consider any information concerning the background, character, and conduct of the defendant.

Federal circuit courts have ruled that a sentencing court can consider the facts which support a defense to the crime when the jury's verdict of guilt necessarily rejected that defense. In *U.S. v. Johnson*, 956 F.2d 894 (9th Cir. 1992), where defendants who were spouses of other defendants defended a drug charge by a claim of duress imposed by their spouses, and *U.S. v. Whitetail*, 956 F.2d 857 (8th Cir. 1992), where a woman

defended a murder charge with a claim of self-defense and battered spouse syndrome, the courts held that the defendants were entitled to have the facts which tended to support their defenses considered in determining a downward departure from the sentencing guidelines.

■ Although Nebraska does not have sentencing guidelines, § 29-2260(3) provides 11 considerations which "shall be accorded weight in favor of withholding sentence of imprisonment." Section 29-2260(3)(d) provides that a sentencing court shall accord weight to the fact that "[s]ubstantial grounds were present tending to excuse or justify the crime, though failing to establish a defense." Further, § 29-2260(3)(e) provides that "[t]he victim of the crime induced or facilitated commission of the crime." Both of these considerations would weigh in Charlene's favor. We therefore find that the sentencing court should have considered the entirety of the evidence relative to the events of that evening, including the facts that Kurt was shot, that Charlene raised the gun to defend herself, that Kurt charged at her while she held the gun, that Kurt had abused Charlene before the night of the crime, and that he had also abused her shortly before she pointed the gun at him.

2. CONSIDERATIONS PURSUANT TO *DECKER* AND § 29-2260

■ In *State v. Decker*, 261 Neb. 382, 398, 622 N.W.2d 903, 917 (2001), the court stated:

> In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. [Citations omitted.] [T]he appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed.

In reviewing Decker's sentence, the court considered his age, formal education, prior criminal convictions, history of substance abuse, and probation screening test results. The court reviewed some of the considerations which judges are directed

to follow pursuant to § 29-2260, such as that there was a substantial risk that Decker would reoffend, that he was in need of treatment that could be provided most effectively by commitment, and that a lesser sentence than that imposed would promote disrespect for the law. The *Decker* court noted that the trial court's finding that the crime was an especially cruel and brutal murder was supported by the record, and concluded it could not say that a sentence near the maximum was an abuse of discretion. The offender and the crime in *Decker* are so different from that of the case at hand that the court's analysis on these points is of no assistance.

The *Decker* court quoted Judge Buckley's dissenting opinion in *State v. Ruisi*, 9 Neb. App. 435, 616 N.W.2d 19 (2000), which stated: " '[The Supreme Court] has not foreclosed any sentence within statutory limits from being excessive, but it strongly suggests it is a rare exception.' " *Decker*, 261 Neb. at 398, 622 N.W.2d at 917. The court cited Judge Buckley's dissent in detail and concluded that "to the extent that the majority opinion suggests that a sentence within statutory limits can never be the product of an abuse of discretion, it is disapproved." *Id.*

In the case at hand, defense counsel argued for probation and analyzed the facts under § 29-2260. The trial court's statements at the time of sentencing indicated that the chief criteria the judge used to justify imprisonment were from § 29-2260(2)(b) and (c), that is, that Charlene was in need of treatment that could best be provided by commitment at a correctional institution for at least 2 years and that lesser sentences would depreciate the seriousness of her crime. The judge did not indicate why he felt Charlene needed 2 years' incarceration, and his principal reliance was upon § 29-2260(2)(c).

### (a) Social and Cultural Background

Charlene is 50 years old. She attend high school until the 11th grade and obtained her high school diploma through the GED program so she could enlist in the Army National Guard. She served in the National Guard for several years and was honorably discharged after she married Kurt. She met and married Kurt in Alaska in 1982. They moved to Nebraska where his extended family resided. They rented a farm located 3 miles

from Gordon from his family and later bought it. She worked on the farm during the early years of the marriage, but in later years, she mainly worked in the home.

The evidence shows that after several years, Kurt and Charlene's feelings for one another changed. They insulted and verbally abused each other and poked, pinched, and otherwise irritated each other both physically and verbally. However, it is also clear that Kurt had the physical and economic power in the Oldenburg household. Charlene had tormented him, but at times, he had clearly abused her. Several years before the shooting, he had pushed her down and bashed her head against the floor. Once he took the keys to the motor vehicle she used and kept them for several days, thus isolating her on the farm. Once he took KayCee to South Dakota without telling Charlene where they were going, why they were going, or how long they would be gone. A few weeks before the shooting, Kurt had spanked Charlene in his words "hard enough to be humiliating but it wasn't anything really painful I don't think." He was definitely stronger than her, but he claimed Charlene stated that she was not afraid of him. Without dispute, Kurt physically and emotionally abused Charlene on these occasions; however, she was also guilty at times of emotionally abusing Kurt.

Both Kurt and Charlene smoked marijuana for many years, but there is no suggestion that they were anything other than "recreational" users. Both used alcohol, but there is no indication that Charlene abused it to any significant degree. The PSR shows that Charlene is respected and liked by all of her close family, with the exception of Kurt. Letters from members of her extended family, including her adult child and even her first husband's family, demonstrate that at a very minimum, she is liked and respected by them and several professional people she came in contact with. Her children by Kurt are clearly closer to her than they are to him. Except for the marijuana use, we find a great deal of evidence which would weigh in Charlene's favor in considering her as a candidate for probation or for imposing a lesser sentence than the crime might otherwise justify. We think based on the record before us, it would be an abuse of discretion to consider the aspects of Charlene's previous life as indications that she needed correctional treatment or that she should be punished severely.

### (b) Need for Correctional Treatment

At the time of sentencing, Charlene was 48 years old and had only been arrested once some 20 years before for possession of marijuana, and that offense was established only by her own admission. The only other fact which detracted from her middle-class status in a small rural town was her and Kurt's regular but apparently infrequent use of marijuana. Until the incident in this case, Charlene was an unhappily married, church-going house-wife and mother of two children, who lived and worked on a farm. The probation officer stated in the PSR that a "Domestic Violence Inventory Assessment" showed that Charlene was at high risk for drug-related problems, but her score in the areas of violence, alcohol, and stress coping were in the medium-risk area. We observe that Charlene was not under the influence of drugs or alcohol at the time of the crime and that there is no indication that her use of marijuana and alcohol induced her to commit the crime. Kurt was intoxicated at the time of the crime, and there is no indication that Charlene had anything to do with his reaching that state. We cannot imagine what beneficial correctional treatment Charlene might receive in prison. The evidence does not support a finding that Charlene was in need of correctional treatment.

### (c) Amount of Violence Involved
### in Commission of Crime

The judge's second expressed justification for the severe sentences was his indication that the crime was an "incredible inciden[t] of violence." He stated that people need to know that when violence occurs, the "system" takes note and does something about it so people feel safe. This statement reflects a consideration of § 29-2260(2)(c), which states that a court may withhold a sentence of imprisonment unless, inter alia, "[a] lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for the law." This issue is similar to the sentencing consideration referred to in *State v. Decker*, 261 Neb. 382, 398, 622 N.W.2d 903, 917 (2001), as the "motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime."

A consideration of this issue must begin with a recognition that the jury found Charlene not guilty of the felonious assault

charge. Kurt undisputably suffered serious bodily injury as a result of the shooting, and Charlene was admittedly holding the gun when it went off. The jury was not instructed on self-defense in connection with the felonious assault charge. Therefore, the jury's verdict of not guilty of that crime could only be based upon a finding that Kurt was shot accidentally. The trial judge's statements about the verdict possibly being a compromise verdict certainly indicate that the judge ignored the verdict on the felonious assault charge when considering sentences on the two convictions. This is further evidenced by the judge's statement indicating that the crime was an "incredible inciden[t] of violence."

In the case before us, the evidence of the intent element of the felonious assault charge is necessarily circumstantial. Kurt testified that Charlene put the gun to his neck and pulled the trigger. The position of the wound makes it almost certain that he could not have seen her pull the trigger. We know for certain only that he was shot while she held the gun after he charged her and attempted to overpower the hand in which she held the gun. She did not shoot him before or during the time that he charged across the room to take the gun from her. Circumstantial evidence might justify a conclusion that she deliberately pulled the trigger, but her hesitancy hardly makes the act a vicious one.

The probation officer supports the recommendation in the PSR of incarceration in part upon the basis that Charlene placed her children's lives in jeopardy and the opinion that she "could have made a different choice, years ago." When pronouncing the sentences, the judge said Charlene "whipp[ed] out the gun . . . that's why somebody was hurt." The judge also stated that people situated similarly to Charlene need to know that when violence occurs, particularly deadly weapon violence, the "system" does something about it. He stated that if he did not impose "proper" sentences, people would not feel safe.

It is clear that the probation officer and the judge considered the fact that Charlene drew the gun to be a major cause of the shooting. However, no mention is given to the situation in which Charlene found herself at the time she pointed the gun. On the night in question, Kurt came home admittedly very drunk. The evidence that Kurt physically abused Charlene is undisputed

and supported by Kerry and photographs of her injuries. The evidence is undisputed that Kurt is larger than Charlene, that he had physically abused her before and had subjected her to a humiliating spanking a few days before, and that he had shaken her and bruised her a few minutes before she pointed the gun at him. Kurt was drunk and angry without reason. Charlene was thus in a rural area with an intoxicated and angry person with a history of physical abuse who had only moments earlier abused her. These facts are not disputed. Kurt's claim that he was "incensed" at having a gun pointed at him in his own home is a ridiculous excuse for charging at Charlene while she held the gun. It can only mean that he intended to take that gun away from her. No reasonable person in Charlene's position, given the history of spousal abuse, would expect that Kurt would stop at merely taking the gun from her. Kurt's rights in his own home can be no greater than Charlene's right to be free from physical abuse in her own bedroom.

In summary, there was clear evidence that Kurt would have used such force against her as he thought necessary to get his way. The question comes down to Charlene's right to point the gun to protect herself.

### (d) Self-Defense

The only act Charlene perpetrated that would support a guilty verdict on the terroristic threats charge is that of pointing the gun at Kurt, coupled with her statement to him at that time. There are three versions of what her statement was, but they can all be summarized as a statement which conveyed the message of "do not come any closer or I will shoot to defend myself."

■ Our self-defense statute, Neb. Rev. Stat. § 28-1406 (Reissue 1995), provides, in significant part, that "[a] threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, shall not constitute deadly force." The jury was not instructed on this statute, but, rather, was instructed on self-defense (no deadly force) as provided in NJI2d Crim. 7.1. A self-defense instruction that instructs on the right to self-defense where no deadly force is involved does not seem to apply to the

situation in this case. Principally, such an instruction ignores § 28-1406. The PSR and the judge's statement about the extreme violence of Charlene's act also indicate that the judge ignored § 28-1406.

We realize that pointing a gun at a person can constitute a criminal assault. See, generally, *State v. Kistenmacher*, 231 Neb. 318, 436 N.W.2d 168 (1989); *State v. Machmuller*, 196 Neb. 734, 246 N.W.2d 69 (1976); *State v. Brauner*, 192 Neb. 602, 223 N.W.2d 152 (1974). Therefore, the pointing of a gun, even· if doing so is not the use of deadly force, can be a threat to commit a crime of violence and hence can be a terroristic threat under § 28-311.01. However, pointing a gun in self-defense is necessarily less serious than pointing a gun when no issue of self-defense is involved. The latter might correctly be termed a crime of extreme violence, but the former is not. We do not consider a possible error in instructing the jury on self-defense because no such error was assigned, but we do conclude that the principle stated in § 28-1406(3) and the common sense upon which it is based should be considered in evaluating Charlene's conduct for purposes of sentencing.

There is of course an issue of whether Charlene pointed the gun only to create an apprehension in Kurt's mind that she would use deadly force if necessary. She testified that she tried to unload the gun before he returned, and Kerry corroborated her testimony. If Charlene intentionally shot Kurt, it was not until he was actually grappling with her right arm in the process of taking the gun, her only protection, from her. The situation was such that Charlene might not have been justified as a matter of law in pointing the gun at Kurt, but it clearly deprives that act of the extreme violence which the sentencing judge and the probation officer seem to attribute to it. The record does not indicate that the court considered any of these issues, and we conclude that it was an abuse of discretion for the court to not consider this undisputed evidence.

### (e) Was Charlene Candidate for Probation?

The judge stated that he did not think Charlene would abide by probation, because while awaiting trial, he had told her to stay away from her "boyfriend" and she had more or less agreed

but saw him nonetheless, and then lied about it under oath. After studying the entire record, we are at a loss to understand why the judge felt justified in ordering her to stay away from the boyfriend. The boyfriend had no connection with the crime. There was no reasonable possibility that he would be a relevant witness in Charlene's prosecution. Charlene's adulterous activity was immoral by the standards of most people in our society, but the courts have long ago quit using judicial power to enforce social mores or morals that are not illegal. Adultery has not been a crime in Nebraska for many years. There is no indication that the boyfriend was likely to encourage her to not appear to face the charges against her. Although there was evidence of Kurt's infidelity as well, Kurt was not on trial.

Because no error on this evidence is assigned, we do not consider whether it was error for the judge to allow evidence about Charlene's extramarital relationship, both before and after the shooting, into evidence before the jury. We do take the court's ruling on that evidentiary issue and the judge's statements at the time of sentencing as indications that he used the adulterous conduct as a reason for not granting Charlene probation and for imposing severe sentences, and we find that the trial court abused its discretion by considering this conduct in sentencing.

## VI. CONCLUSION

There is no indication that Charlene would have shot the gun if Kurt had not charged at her. If Kurt had not charged her, no one would expect serious criminal charges to have resulted from Charlene merely pointing the gun and threatening to shoot if he came closer. The judge stated that if he did not impose proper sentences, by which he clearly meant incarceration, people would not feel safe and would feel like the system let them down. Yet what do such sentences convey to other isolated helpless people who are forced to defend themselves from physical abuse? Must women or other physically weaker persons undergo a beating for fear of being sentenced to a long term of prison if they point a gun at their assailant with a warning to stay away. We conclude that the mistaken attitude of the trial judge on this point, his failure to consider Charlene's clear effort to defend herself from violence, and his overemphasis of her marital infi-

delity resulted in an abuse of discretion and excessive sentences. Further, the court's reasons for imposing harsh sentences were clearly untenable and unfairly deprived Charlene of a just result.

The trial judge did not allow Charlene out of prison on bond while this appeal was pending. She has therefore served more than 2 years of her sentences. Neb. Rev. Stat. § 29-2308 (Reissue 1995) provides that an "appellate court may reduce the sentence rendered by the district court against the accused when in its opinion the sentence is excessive, and it shall be the duty of the appellate court to render such sentence against the accused as in its opinion may be warranted by the evidence." See, also, *State v. Etchison*, 188 Neb. 134, 195 N.W.2d 498 (1972). While we would certainly have considered sentences of probation if Charlene had not already served so much of the sentences, she has already served more time in prison than she should have been sentenced to, and we therefore modify the sentences to 1 year for each of the crimes. Because § 28-1205 requires the sentences to be served consecutively, we so provide.

AFFIRMED AS MODIFIED.

HANNON, Judge, concurring in part, and in part dissenting.

I fully agree that the sentences in this case are too severe and excessive by any measure and should at a minimum be reduced as the majority has done. However, in my opinion, several errors in the admission of prejudicial evidence and in instructing the jury on self-defense would justify reversal upon the basis of plain error. I would go even further and vacate the convictions as a matter of law because Charlene met her burden of going forward with evidence of her need for self-defense and the State did not disprove that evidence. See *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). In this case, the terroristic threats statute, which was designed for clearly different circumstances than that in which Charlene found herself, has been used to severely punish a woman who was attempting to defend herself against a drunken, angry, and abusive husband. I do not think it is or should be against the law for a person who has just been physically abused to point a gun at his or her abuser and warn that abuser not to come any closer. A person does not have to be a saint or a paragon of virtue to be entitled to use self-defense. In my view, Kurt's tragic injury was caused by his foolish act of

charging a gun, which under the circumstances, Charlene had the right to point at him. His intoxication is not an excuse for his foolish act.